KING, Judge.
The sole issue presented by this appeal is whether or not the trial court erred in finding the decedent 90 percent comparatively negligent in causing an automobile accident.
Tammaye Rachal (hereinafter plaintiff), individually and on behalf of her minor daughter, Jamie Lynn Rachal (hereinafter the child), instituted a wrongful death action against the State of Louisiana, through the Department of Transportation and Development (hereinafter defendant), for damages resulting from a one-ear accident in which plaintiff’s husband and the child’s father, Charles Keith Rachal (hereinafter decedent), was killed. Defendant filed third party demands against the City of Alexandria, Hall and Holland Construction Company, and Robert Marler, who was a guest passenger of decedent’s vehicle at the time of the accident. The trial judge found the decedent 90 percent comparatively negligent in causing the accident, which reduced the damages awarded plaintiff to $38,210.00 and those awarded the child to $6,840.00. The third party demands filed by the defendant were dismissed without prejudice.
Both parties filed motions for new trial. The trial court denied the motions on January 27, 1986.
Plaintiff filed a petition for a devolutive appeal on February 26, 1986. Defendant did not file for a devolutive appeal until April 1, 1986, which was more than 60 days from the denial of the motions for new trial. This Court ex proprio motu issued a rule to show cause why defendant’s appeal should not be dismissed for failure to timely perfect its appeal under LSA-C.C.P. Article 2087. On May 22, 1986, this Court dismissed defendant’s appeal. 489 So.2d 459. Defendant’s application for a rehearing was denied on June 25, 1986. This judgment of dismissal is now final.
Thus, the only assignment presented for our consideration is plaintiff’s assertion that the trial court erred in finding decedent 90 percent comparatively negligent. We affirm the judgment of the trial court.
The trial judge rendered a written opinion giving findings of fact and extensive and well considered reasons for judgment. After a thorough review of the record, we find that the trial judge’s rulings are correct. We adopt the trial judge’s excellent written reasons for judgment, relating to *1001 the findings of fact and the issue of comparative fault, as our own opinion in this case. The pertinent parts of the trial judge’s opinion are set forth as follows:
“This is a wrongful death action. The plaintiff, Tammye Rachal, is the widow of Charles Keith Rachal, who was killed instantly when the pick-up truck he was driving struck the concrete abutment in the median of the highway under a railroad overpass on Winn Street in the City of Alexandria. Plaintiff sues individually and on behalf of Jamie Lynne Rachal, minor child of plaintiffs marriage to the decedent. The defendant is the State of Louisiana, through the Department of Transportation and Development. Plaintiff contends the defendant breached its duties to construct and maintain the highway in a safe condition and that this was the sole cause of the accident. The defendant contends, essentially, that the sole cause of the accident was the decedent’s excessive speed, intoxication, and failure to avoid striking the concrete abutment.
“The State filed third party demands against: (1) City of Alexandria, on the theory that it has a contract with the State to maintain the underpass; (2) Hall and Holland, who constructed the underpass in 1957; and (3) Robert Marler, a passenger in the pick-up truck at the time of the accident who grabbed the steering wheel immediately prior to the collision. (TR. 20)
“The accident occurred at approximately 7:53 P.M. on August 19, 1981, during hours of daylight. At the scene of the accident, the highway has four lanes, two for northbound and two for southbound traffic. The two northbound lanes are Fulton Street and the two southbound lanes are Winn Street in the City of Alexandria. Under the underpass the northbound and southbound lanes are separated by a median which is IOV2 feet in width. The concrete pier, which is 2V2 feet wide, is located in the center of this median and is a distance of 4 feet from the inside edge of each traffic lane respectively. There is a concrete barrier curb, 6 inches high, along each side of the median. North of the underpass, Winn Street and Fulton Street separate, forming a “Y”, and return to their pre-construction locations of about one block apart.
“Signs posted on Winn Street north of the underpass showed the speed limit of 35 miles per hour. There was also a sign warning of the curve in Winn Street to the left as it went down to the underpass.
“Robert Marler testifed [sic] in his deposition that he and Charles Rachal had been close friends for about three years and on the day of the accident they had met about 1:00 P.M. and during the rest of the day had visited several friends in Alexandria and Pineville during which time they consumed about one six pack of beer. At about 7:30 P.M. they left Pineville and crossed the bridge over Red River into the city of Alexandria on Winn Street. They stopped at a traffic light two or three blocks north of the railroad underpass and then proceeded on south. In his deposition, Marler states they were going 35 to 40 miles per hour and were in the right hand lane as they came to the underpass. As they turned toward the left and went down under the underpass, Rachal crossed over into the left hand lane and Marler felt a ‘bump’ as the left-hand wheels of the vehicle went over the curb. The evidence shows this occured [sic] about 70 feet from the pier. Marler says he saw the pier and tried to grab the steering wheel and turn the truck to the right, but the left front of the truck struck the concrete pier. The collision was violent, crushing the entire left front and left side of the truck, and throwing Rachal’s body out onto the pavement. The truck came to rest 120 feet from the point of impact and caught fire and burned. Marler escaped without serious injuries. Rachal was killed instantly.
“In a statement made to the police on the night of the accident, Marler said that immediately before the collision they were going 50 to 55 miles per hour and he told Rachal they were going too fast and to slow down. Marler said he screamed at Rachal and reached over and grabbed the steering wheel and tried to turn the truck away from the pier.
*1002 “After the accident, Dr. Scheuerman, Rapides Parish Coronor [sic], went to the scene and obtained a blood sample from Rachal’s body which later analysis by the Louisiana Crime Laboratory showed the blood contained 0.21 per cent ethyl alcohol. [TR. 569] Mr. Jimmy Barnhill, an employee of the North Louisiana Crime Laboratory and an expert in the effects of blood alcohol on human behavior testified that at this level of alcohol in the blood a person of Rachal’s weight, which was 180 pounds, would be highly intoxicated to the extent that his vision, judgment, speech and reaction time would be seriously impaired. [TR. 469]
“During the trial, the plaintiff attempted to prevent the introduction of the evidence regarding the taking of the blood sample by the coronor [sic] and the subsequent analysis and explanation. However, the Court found that all of this evidence was admissible. Plaintiff’s principal argument in his post-trial brief is that the blood sample could have been contaminated by a rupture of the stomach allowing its contents to be present around the heart or in the heart itself at the time the sample was taken. There is no evidence to support this argument. Dr. Scheuerman testified that although he could not remember the details of this particular incident, his records show that he took the blood sample from the decedent on the night in question and that he probably followed his ususal [sic] procedure of entering the needle into the heart muscle itself from which he took the sample. [TR. 638] Moreover, Dr. Scheuerman testified it would be most unusual for any alcohol which escaped from the stomach to penetrate the heart muscle itself. [TR. 653] The evidence shows by a clear preponderance that the blood sample was properly taken from the heart and that it was not contaminated.
“The first issue is whether the Department of Highways was negligent in it’s [sic] construction or maintenance of the underpass and its approaches. Both counsel for plaintiff and for defendant cite Sini-tiere v. Lavergne, 391 So.2d 821 (La.1980) for the general rule as to the duty of the State to maintain its highways. The Supreme Court states:
“ ‘It has been repeatedly stated that the Department is not a guarantor of the safety of travelers, but[,] rather, owes a duty to keep the highways and its shoulders reasonably safe for non-negligent motorists. Liability based upon negligence is imposed when the Department is actually or constructively aware of a hazardous condition and fails to take corrective action within a reasonable time.’ ”
“Plaintiff cites two cases from our appellate courts involving obstructions constructed and maintained on the shoulder near the main traveled portion of the highway. In Garrick v. Washington Parish, 440 So.2d 787 (La.App. 1st Cir.1983) [writ den., 444 So.2d 1222 (La.1984)] plaintiff drove onto the shoulder of the road to avoid striking a vehicle parked in her lane and she struck a concrete loading platform which extended from a roadside store to approximately 2½ to 3 feet from the main traveled portion of the highway. Citing Sinitiere, the Court held the concrete platform within about 3 feet of the roadway was an unreasonably hazardous condition and that the State’s failure to remove the hazard or to post warning signs or otherwise give adequate protection was a breach of the State’s duty. In Efferson v. State, Through Department of Transportation and Development, 463 So.2d 1342 (La.App. 1st Cir.1984) [writ den., 465 So.2d 722 (La.1985) ], the driver of a pick-up truck negligently lost control in a reverse curve on a rural highway, and the vehicle went down a steep enbankment [sic] where it struck trees growing approximately 9 feet from the main traveled portion of the highway. Even though the driver of the vehicle was negligent, the Court applied the Sinitiere rule and held the State negligent in failing to place proper warning signs and in allowing trees to grow too close to the main traveled portion of the highway on the outside of the curve. The district court held the State solely at fault. The court of appeal reversed in part and applied comparative fault to hold the State 20 per cent at fault and the driver of the vehicle 80 per cent at fault.
*1003 “In the present case the plaintiff introduced the testimony of two experts who concluded that the highway was unreasonably hazardous and that this was a cause of the accident. Dr. Olin H. Dart, Jr. testified that in his opinion an unreasonable hazard was created for traffic going south on Winn Street under the underpass because of the curve first to the left and then to the right on the steep downgrade and the fact that the slope of the left hand lane was toward the median, which caused vehicles to have a tendency to go in that direction. [TR. 242] It was Dr. Dart’s opinion that this was a design defect and should have been corrected either by removing the pier or, if that was too expensive, to provide guardrails or attenuators to protect against vehicles striking the pier with great force. [TR. 243] Dr. Dart performed a ‘ball-bank’ test from which he concluded that a safe speed at the underpass was 30 miles per hour in both lanes and speed should have been so restricted. [TR. 228] He stated that a careful driver who was familiar with the underpass could have safely traversed it at 45 miles per hour, but, nevertheless, his final opinion was that the highway was unreasonably hazardous. [TR. 248]
“Dr. Dart also testified that when this underpass was constructed in 1957 it complied with the manual for highway construction safety which permitted obstructions on the shoulder within 4 feet of the main traveled portion of the highway, but later revisions of the manual required a clearance of 6 feet, and in addition that either guardrails or attenuators be provided. [TR. 233, 263]
“Under cross examination, Dr. Dart stated that considering the extensive damage to the vehicle and the fact that it traveled 120 feet after the impact it must have been traveling at least 45 to 50 miles per hour at the time of the collision. [TR. 293] He stated that in his opinion the excessive speed and probably the intoxication of the driver were contributing causes of the accident. [TR. 323] Furthermore, as regards the testimony that Marler grabbed the steering wheel at the last moment, Dr. Dart said that in view of the fact the vehicle was only about 70 feet from the pier when Marler grabbed the steering wheel there was not time for this action by Mar-ler to have been a cause of the accident. [TR. 321]
“Plaintiff also called as an expert Mr. Dwayne T. Evans, a traffic engineer, who stated that due to the first curve to the left and then the second curve back to the right on the steep downgrade and the slope of the inside lane toward the median he thought a safe speed was 30 miles per hour in the right hand lane and 25 miles per hour in the left hand lane. [TR. 175] He also used a ‘ball-bank’ device to determine these safe speeds. His conclusion was the highway design at the underpass was unreasonably hazardous and that this was a cause of accident. [TR. 178]
“The State introduced no expert testimony to contradict the opinions expressed by plaintiff’s experts, as stated above, that an unreasonable hazard existed due to the construction and maintenance of the highway. Counsel for the State cites several cases which he contends hold that if the highway department meets standards applicable at the time of construction this is all the State is required to do, even though the standards are later changed. The State cites Roberts v. Winston Carriers, Inc., 304 So.2d 818 (La.App. 3rd Cir.1974) [writ ref’d., 309 So.2d 341 (La.1975)]; Usry v. Louisiana Dept, of Highways, 402 So.2d 240 (La.App. 4th Cir.1981) [writ den., 404 So.2d 1259 (La.1981)]; Devall v. Morgan, et al., 424 So.2d 522 (La.App. 5th Cir.1982), [writ den., 427 So.2d 1214 (La.1983) ]; and Dagnall v. Louisiana Department of Highways, 426 So.2d 276 (La.App. 4th Cir.1983) [writ den., 433 So.2d 160 (La.1983)]. The Court has read these cases and does not construe them as supporting the rule urged by the State. As the Court reads these opinions, they hold that the mere fact that the State has failed to change it’s [sic] highways to meet the new standards does not establish the existence of a hazardous defect. Regardless of whether State has changed it’s [sic] highways to meet new requirements of the construction manual *1004 on safety, the duty of the State is that stated in Sinitiere, quoted above, which is that the State must maintain it’s [sic] highways and the shoulder thereof in a reasonably safe condition free from unreasonably hazardous conditions. This Court concludes that the mere fact that the pier constructed in 1957 within 4 feet of the main traveled portion of the highway was in compliance with the manual at the time, did not automatically relieve the State of it’s [sic] duty to either remove the pier, or, if that was too expensive, to provide guardrails, attenuators, or warning signs.
“From the evidence produced in this case, particularly the opinions expressed by the plaintiff’s experts, the Court must conclude that the highway and it’s [sic] shoulders were not reasonably safe for non-negligent motorists under the duty imposed upon the highway department by Sinitiere. For the reasons stated in Efferson v. State, Through Department of Transportation and Development, Supra., in which our Supreme Court denied writs, the duty of the State extends to negligent as well as non-negligent motorists. There is no question in the present case that the State had actual or constructive knowledge of the hazardous condition which had existed for many years. Therefore, the State was negligent.
“Moreover, the State breached it’s [sic] duty under the theory of strict liability. In Kent v. Gulf State Utilities Company, 418 So.[2d] 493 (La.1982) our Supreme Court held the only difference between strict liability and negligence theories of recovery is that in strict liability knowledge of the hazardous condition by the defendant is not required.
“The next issue is whether the negligence of the State was a cause of the accident. As to the failure of the State to post a ‘reduced speed’ sign or a curve sign at the immediate approach to the underpass, the evidence in the present case does not support a finding that any failure by the State as regards such signs was a cause of this accident. Robert Marler testified in his deposition that Rachal lived in the area and used this underpass almost daily in going to and from work and was therefore thoroughly familiar with the underpass. Of course, the evidence does not show whether Rachal saw the speed limit sign on the day of the accident, but this is immaterial in view of his familiarity with the underpass.
“However, the hazardous condition in the design and maintenance of the highway, as explained by plaintiff’s expert witnesses Mr. Evans and Dr. Dart, was a cause of the accident. These two experts expressed the opinion that a combination of the curve to the left and then back to the right on a downgrade within a short distance and with the slope of the outside lane toward the median made it difficult to maneuver through this underpass and tended to cause the motorist to go to the left, where the concrete pier was only 4 feet from the edge of the main traveled portion of the highway and there were no guardrails or attenuators (shock absorbers) to protect against a severe impact on the pier. Both experts expressed the opinion that these defects were causes of the accident. Dr. Dart went so far as to state that if guardrails along the median in advance of the pier or attenuators at the pier had been in place the impact may have been reduced to the extent that Rachal would not have been killed. This Court concludes that the negligence of the highway department was a cause of the accident.
“The next question is whether Ra-chal was also negligent. As stated above, the blood sample taken from Rachal’s body immediately after the accident showed that he had 0.21 per cent ethyl alcohol in his blood. Considering Rachal’s weight of 180 pounds, this was sufficient, according to the testimony of the expert witness Mr. ■Barnhill, to cause a high state of intoxication. Rachal’s vision, reaction time and judgment were severly [sic] impaired. This probably was a major cause of the accident. Moreover, Rachal was traveling at a highly excessive speed. Plaintiff's own expert witness, Dr. Dart, expressed the opinion that considering the severity of the impact and the fact that the vehicle traveled 120 *1005 feet after the collision, it must have been going 45 to 50 miles per hour. This was also clearly a major cause of the accident. Dr. Dart stated that in his opinion Rachal’s intoxication and excessive speed were causes of the accident.
“Having found both the State and Rachal negligent, the next problem is to determine what proportion of the entire negligence which caused the accident is attributable to Rachal, under our comparative fault system established by Louisiana Civil Code Article 2323. In the recent case of Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2[d] 967 (La.1985) our Supreme Court has for the first time established certain guidelines for determining the percentages of fault where comparative fault is applicable. In that ease, a 12-year old deer hunter shot and killed with a high-powered rifle another hunter who was walking across a field without an orange vest. A jury held that the 12-year old hunter and his father were without fault. The Supreme Court reversed in part, holding that 20 per cent of the fault was attributable to the decedent, 40 per cent attributable to the boy’s father for allowing him to use the high-power[ed] rifle without proper instruction and 40 per cent of the fault was attributable to the boy himself. The Court used the case to establish guidelines for determining percentages of fault as follows:
“ ‘We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporate[s] direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the casual [sic] relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances [which] might require the actor to proceed in haste, without proper thought.’ ”
“Applying these guidelines to the present case, the Court will first consider the nature of the conduct of the State and of Rachal. As to' whether the conduct was inadvertent or was willful, both the State and Rachal were aware of the danger of their conduct. The State had prior knowledge of this hazardous condition and Ra-chal was certainly aware of his excessive speed and highly intoxicated condition. Both the negligence of the State and of Rachal created a risk of harm. However, on balance, this Court is of the opinion that the negligence of Rachal was much more willful and created a much greater risk of harm than the negligence of the State. Factors numbered 3, 4 and 5 above have little application to the present case, except that under factor 4 stated above the capacity of Rachal to cause or avoid the accident was superior to that of the State.
“Next addressing the question of the extent of causal relation between the conduct of the parties and the damages claimed, this Court is of the opinion that Rachal’s intoxication, excessive speed, losing control of his vehicle and driving over the barrier curb into the concrete pier were the major causes of this accident.
“After weighing all of these factors discussed above, this Court assigns to Rachal 90 per cent of the fault and to the State 10 per cent of the fault.
[[Image here]]
“Under the rules of our comparative fault statute, Civil Code Article 2323, the total damages suffered by the widow and child must be reduced in proportion to the degree of negligence of Mr. Rachal. Thus, the award to the widow is reduced to $38,- *1006 210.00. The award to the child is reduced to $6,840.00.”
The findings of a trier of fact as to the percentage of fault are factual and, in the absence of clear or manifest error, must be upheld on appeal. McCoog v. Roberts, 488 So.2d 310 (La.App. 3 Cir.1986), writ den., 493 So.2d 637 (La.1986); Courmier v. Travelers Ins. Co., 486 So.2d 243 (La.App. 3 Cir.1986), writ den., 489 So.2d 250, 251 (La.1986); Motton v. Travelers Ins. Co., 484 So.2d 816 (La.App. 1 Cir.1986). We find that the trial judge adequately considered the facts and made a correct determination as to the percentages of fault attributable to the decedent and the defendant. Finding no manifest error, we affirm the decision of the trial court.
All costs of the appeal are assessed to plaintiff-appellant.
AFFIRMED.