WICKER, Judge.
The State of Louisiana Department of Transportation and Development (DOTD) suspensively appeals a judgment in favor of the plaintiffs, Holly Guillie, individually and on behalf of her son, Edward Clayton White; and Tina Ronquille, on behalf of her daughter, Brandy Guillie. The issues are the liability of DOTD for a substandard highway shoulder and damages. We reverse.
Edward Guillie, III was driving his truck on Highway 45 in Lafitte at about 5:00 A.M. on December 24, 1984. The two-lane highway was under construction, and Guil-lie had a blood alcohol level of 1.5 percent. His truck left the roadway and went onto the shoulder, spinning and overturning, and pinning Guillie under it. He died of compressive asphyxiation.
Holly and Tina sued DOTD and Jefferson Parish Department of Roads and Bridges. They later added Barriere Construction Company, Inc., the road contractor, and Lafitte-Barataria-Crown Point Fire Department, alleging negligence in handling the accident. DOTD third-partied Barriere. Holly and Tina have since dismissed Jefferson Parish, Barriere, and the fire department.
DOTD filed exceptions to the right of Holly to recover on behalf of her minor child, Edward, who was born prior to her marriage to Guillie and who was never adopted by him. The judge referred these exceptions to the merits.
The judge found that the actions of DOTD in allowing a substandard road shoulder “created a dangerous situation which was a proximate cause and cause in fact of [Guillie’s] death.” He found Guillie to be fifty percent at fault due to his intoxication and reduced the total award of $407,548.00 by that percentage.
DOTD complains of several errors: the finding that the shoulder was dangerous and the cause of the accident, the apportionment of comparative fault, the amount of damages, and Edward’s entitlement to recover under the wrongful death statute.
LIABILITY OF DOTD
DOTD contracted with Barriere to widen a stretch of Highway 45 in Lafitte, Louisiana. The contract called for widening the lanes of this two-lane highway to eight feet on the straightaway and ten feet on curves. The roadway would be a nine-inch layer of asphalt, topped by a two-inch binder course of asphalt, finally topped by an inch-and-a-half thick wearing course of asphalt. The contract required shoulders an average of three feet wide, making them narrower where the lanes were ten feet wide and wider in the eight-foot-lane areas. Shoulders would be composed of a four-inch aggregate surface course (reef shell) laid over the existing shoulder, which would be spread, compacted, and dressed. The resulting roadway would not meet DOTD’s own standards for rural roads of this type, found in its Minimum Design Standards for New Construction or Major Reconstruction of Rural Highways and Roads, which called for shoulder widths of eight to ten feet.
The critical issue is whether this admitted deviation from its standards constituted fault on the part of DOTD and, if so, whether the deviation was a cause-in-fact of the accident.
There were no witnesses to the accident, and Guillie died without giving a statement. The accident was reconstructed by an expert witness for each side, who greatly differed in their conclusions. These two witnesses also disagreed with regard to whether or not the road in question failed to meet applicable standards.
*814 Col. Joseph Andre testified for Holly and Tina as an expert in automobile accident reconstruction but not in highway design or safety. He examined the scene about three weeks after the accident, where he took photographs. He also reviewed the accident report, the construction contract, and the depositions of DOTD’s expert and employees of DOTD and Barriere. He found the shoulder at the accident site to be two feet three inches wide and constructed of a thick layer of loose shells which he could push off the road with his hand or foot. He didn’t believe it would be possible to sufficiently compact these shells into a hard surface because they were not the type of material which can be compacted. The danger in the shoulder was that a vehicle driven onto it would bog down, get stuck, and get pulled in the ditch. He also found the slope of the shoulder too steep, with a ratio of 1.5 to 1, where the standards call for 3 to 1. Based upon his observations, his reading, the accident report, the depositions, his investigations of the accident scene, and his examination of the truck, he believed the truck went onto the shoulder going ten to twenty miles per hour at a ten to fifteen degree angle. When the right side of the truck went onto the shoulder, the right front wheel started caving down, putting drag on the right side of the vehicle. The truck began to rotate increasingly until the left front went on the shoulder and bogged down. Then the rear of the truck rotated and the truck overturned against the back slope of the ditch. Had the shoulder been hard, the truck would have simply gone straight on down to the ditch. On cross-examination, he testified he knew nothing of the condition of the shoulder the night of the accident because he wasn’t there; that, while the tire tracks in the photographs might appear straight, they had a slight arc consistent with his opinion on causation; and that it was possible the loose shells he saw on inspection had been added after the accident. He believed that if Guillie had not been ejected he would not have been fatally injured. While he conceded the blood alcohol level, the fog, and the damp roadway, he believed these factors did not necessarily make a difference in causation, especially at a low rate of speed. He also conceded that he had no way of knowing what speed Guillie was driving prior to the accident but could only determine the speed from the time it hit the shoulder until it rolled over in the ditch. He conceded that he would defer to the expertise of traffic engineers and to the specifications in the contract on the issue of suitability of this type of shoulder under the DOTD standards. He concluded the shoulder did not meet the DOTD’s minimum standards for shoulders and was not safe when he saw it.
Dr. Olin K. Dart, Jr. testified for DOTD as an expert in traffic engineering and accident reconstruction. He studied the accident-scene photographs, Andre’s deposition, the project contract and diaries, the police report, and the depositions of employees of DOTD and Barriere. He found it difficult to determine causation because of the lack of physical evidence, but he did note that one of the tires was bare with no tread. [The photograph shows this tire separate from and not attached to the truck, while there were four other tires in place.] He thought that if the roadway surface was slippery it could have caused the problem. Based upon the final resting position of the truck, he believed the truck went out of control before leaving the roadway and had turned one hundred eighty degrees before sliding off the road, across the shoulder, and overturning. He was positive the truck was in rotation before leaving the road and that Andre’s hypothetical was not probable because the marks on the shoulder appear to be the classic direction marks of a vehicle that is rotating. He believed Andre’s hypothetical would have produced more stirring up of the shells on the shoulder. He too believed the truck was going only ten to twenty miles per hour when it went off the road. He thought significant causative factors were the alcohol in Guillie’s blood, his lack of sleep (if established), the dark and foggy night, a fogged windshield (if established), the act of wiping the inside of the windshield (if established), and failure to wear a seat belt. Not causative, according to Dart, were the presence or absence of *815 signs or highway markings. He concluded the consistency of the “gravel” [shells] was not a significant contributing cause of the accident nor was any act or omission of DOTD a significant contributing cause.
With regard to the DOTD’s standards, he believed that the proper standards were those applicable to an overlay project and not to a major reconstruction. [The overlay standards referred to by Dart are not in evidence.]
Well, the major reconstruction would require twelve foot lanes. I believe this required eleven foot lanes and three foot shoulders. A major reconstruction would have required some alignment reconstruction. It would have involved extensive reworking of the drainage system, longer, flatter slopes. It would have taken quite a bit more right away [sic] than they presently have out there to bring the road to the standard in question, and I feel like their main goal here was to get some widening, which is certainly one of the things that you have in highway work is you can widen the surfacing and improve the overall operating characteristics without necessarily having to bring all the shoulders up to standard. The American Association of State Highway and Transportation Officials in 1977 provided for such work under what they call the 3R program, and they state in there that as a minimum for these projects that two feet shoulders were all that was necessary, and it was better to widen the pavement than to try to maintain wider shoulders if that was your alternative. I think that’s the option that the State used if they were trying to upgrade the road within the existing right-of-way, and basically within the same road bed that they had to work with originally.
He did concede that if the composition of the shoulder was such that it couldn’t hold a vehicle without collapsing, it would be the responsibility of DOTD unless the contractor failed to follow the specifications. He stressed that it would not be possible or practical for DOTD to achieve its own standards on every project because limited funds necessitated assigning priorities. He noted that DOTD tries to maintain existing conditions and upgrade surfaces where possible. In this case, he believed that the project which widened the roadway at the expense of shoulder width would greatly improve safety. He conceded the project did not come up to standard; but, in terms of trying to upgrade the highway within the existing right of way by providing a wider travel lane, he believed it did.
He also conceded that there are some cases where a driver wouldn’t be able to avoid an accident even if he was sober. He admitted that if the right front tire were to go off the road and onto the shoulder, and if something caused the right front wheel to stop suddenly, the vehicle would tend to go into clockwise rotation. He believed that the reason three rather than eight-foot shoulders were chosen was to stay within the available right of way; otherwise, DOTD would have had to take more land and undertake much more expensive construction. He conceded that there might be a point between placing the “gravel” [shells] and consolidating and compacting it when the shoulder might not be expected to carry traffic.
He testified the diaries indicated that the shoulder was reworked after the accident, but they also indicated that it was essentially compacted prior to the accident. A second compacting improves density of the material used, which was “crushed shell material.” This material has insufficient interparticulate contact to allow it to support the load as well as it would if an attempt is made through compaction to reorient the particles so they hold together as tightly as possible and to provide internal friction so that it will resist the impact or placement of loads on them through wheels.
Jeffery Bentley testified on behalf of DOTD as its project engineer. He did the supervisory work on a daily basis. He had not tried to locate the accident scene until a month after it had taken place and conceded that he had never physically seen the site and didn’t know if the shoulder had collapsed.
*816 The contract called for widening the road, overlaying it with three feet two inches of asphalt, putting an aggregate surface course on the shoulder, spreading it with a grader, and compacting it with a roller. When the final course is placed on the road, the shoulders are.redressed and rolled again. No more shells are added; they are only redistributed to the roadway grade.
At the time of the accident, the roadway in this area was finished, including dressing the shoulder. There were no bad places in the shoulder. He testified that if a vehicle should inadvertently stray onto the shoulder, the purpose of the shoulder would be to keep the vehicle from falling in the ditch. Prior to the accident [re-surfacing?], the shoulders were almost non-existent in some places. In this place, however, all that was needed was topping the shoulder, since there was a good shoulder that could be driven on.
“If [the shoulder] doesn’t support [the vehicle], that means there may have something happened since shoulder was constructed like a flood, something that has deteriorated the shell shoulder down. That could have happened. But at the time we built the road the shoulder would have supported a car.”
He testified that nothing had happened that would have deteriorated the shoulder. He also testified that if the shoulder didn’t support a car, that didn’t mean the shoulder was built incorrectly. He noted that the slope of the shoulder was the same as the slope of the road — .05 inches per foot— and that the shoulder should slope toward the ditch a little bit for drainage.
Bertrand Wilson, Barriere’s superintendent, testified that he remembered the job very well. At the time of the accident, there was still some driveway work going on but the widening, the wearing course, and the shoulder work were all completed.
The specifications called for a shoulder width of plus or minus four feet. He seemed to testify that the shoulder would have been narrower in curves because the roadway would be wider. His company put in three feet of shell wherever possible. He didn’t believe the shoulder was for driving on but for stopping. He noted that garbage trucks drove on the shoulder. When asked the purpose of a shoulder, he replied, “What is a shoulder of any road for?” He conceded it was meant to support the weight of a car and that if it didn’t it would have been either built or designed improperly. He couldn’t think of any reason this shoulder would have been in bad shape since it had been rolled “time and again” prior to the accident. He admitted that perhaps the outside edge could be collapsed by kicking it. He felt a substantial amount of the shoulder should be able to support a car — perhaps the first one or two feet if not the whole thing. Within one foot of the edge, the shells might slough off. He was asked, “What is the purpose in putting up a three foot shoulder if two feet of it will not support an automobile or, for that matter, a person?” He replied,
“I guess, in an attempt to save — to get what you can. I don’t exactly know the design, you know, wishes of the Highway Department when they did this. The material, for the most part, is very good. The material in some applications isn’t worth a darn.”
During construction, every day the shoulder was shaped, compacted, and finished as per contract. He noted that he didn’t recall any place where the existing shoulder was so soft it would have had to be prepared before shells were put on it. Specifically, he said there had been no substantial repair work to the shoulder within two hundred fifty yards of Fleming’s Curve, the site of the accident. The grader used on the shoulder weighed 15 tons; and it, and the roller, would both travel on the shoulder to do these operations. He also specifically recalled that there were “Low Shoulder” signs in place along the project. There were low shoulders between putting the shells in and the final paving and dressing; however, he didn’t think there were any low shoulders on the date of the accident.
The diaries kept by DOTD concerning the work on Highway 45 were introduced into evidence. No attempt was made to *817 present testimony explaining all the entries and abbreviations in these diaries. However, we can see that during the month preceding the accident, some materials, perhaps asphalt or perhaps shells, were hauled, placed, graded, and/or rolled on twelve different days. On nineteen days, no activity was reported on the project due to rain and/or cold weather. On December 17, six days before the accident, the diary indicates that Barriere finished grading shoulders throughout the project. However, more hauling and placing went on during the following two days; and there is no indication of more grading until January 4, twelve days after the accident. Additional shoulder grading took place on January 10. The project was complete on February 1, and it was inspected and accepted by DOTD on February 8. Obviously, the written evidence of the diaries is in conflict with the testimony of Wilson and Bentley with regard to what work was done and when it was done.
Recent Supreme Court decisions absolve DOTD from liability for substandard roadways on which motorists have been injured. In Manasco v. Poplus, 530 So.2d 548 (La.1988), that Court reversed this circuit and the trial court. The evidence showed that the River Road was a substandard, undivided two-lane road with a gravel shoulder. The defendant truck driver ran off the road and onto the shoulder to avoid hitting a vehicle stopped in his lane; he then hit a fire hydrant in the ditch, which caused the rear of his truck to strike plaintiffs van. The plaintiff argued that the narrow shoulder was a cause-in-fact of the accident because it resulted in the truck driver’s inability to safely retreat to the shoulder and avoid hitting him.
The Court noted:
DOTD’s duty to travelers is to keep the state’s highways and their shoulders in a reasonably safe condition.... Whether DOTD breached this duty, that is, whether the roadway and shoulders at the scene of the accident were in an unreasonably dangerous condition, will depend upon the particular facts and circumstances of each case....
At 549.
The Court balanced the interest in safe roads against the physical and financial impossibility of bringing all of Louisiana’s roads up to modern standards and concluded that “the failure of DOTD to reconstruct the state’s highways to meet modern standards does not establish the existence of a hazardous defect.” At 550. Furthermore, “the stretch of road in question did not present an unreasonable risk of harm and ... DOTD did not breach its duty to keep this portion of River Road in a reasonably safe condition.” At 550. In addition, the court found the plaintiff had failed to show that the substandard road was a cause of the accident, since there was no evidence of any defect which might have caused the truck driver to lose control of his truck, he was very familiar with the road in question, and there was no evidence that he would have been able to avoid the accident even if the shoulder of the road complied with modern standards. It concluded the sole cause of the accident was the failure of the driver to maintain control of his truck.
In another shoulder case, the Supreme Court in Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170 (La.1986), agreed that the state could not possibly meet the burden of bringing all its roads into compliance with modern standards. See also Blanchard v. Department of Transp., 538 So.2d 1049 (La.App. 4th Cir.1988); Jones v. State through DOTD, 536 So.2d 446 (La.App. 1st Cir.1988); and B. Olinde & Sons Co., Inc. v. State, Etc., 421 So.2d 370 (La.App. 1st Cir.1982), writ den. 423 So.2d 1164 (1982).
In Olinde the accident occurred at a time when the DOTD was resurfacing the roadway and the plaintiff driver inadvertently left the roadway and went onto the shoulder, which collapsed under the weight of his truck, causing it to overturn. That case balanced the risk to the drivers using the roadway during construction with the utility of keeping it open during construction. It noted that
to apply strict liability to hazards temporarily occasioned during road repairs would place the state in a “Catch-22” or “no-win” situation whereby the state *818 would be liable in negligence or strict liability for a failure to properly maintain a roadway, but would be also strictly liable for injuries caused as a result of the attempt to repair.
At 371.
We have applied the law concerning DOTD’s liability to motorists for below-standard shoulders to the facts in this case. Those facts are that Guillie was familiar with the area where the accident happened, having driven it at least twice a day to and from work; Guillie was legally intoxicated by virtue of his blood alcohol level; the roadway was wet at the time of the accident; and DOTD had undertaken to make improvements to Highway 45 which, even if they failed to bring that roadway up to its own standards, would greatly increase the safety of the roadway for use by motorists. We are aware that the judge’s conclusions with regard to conflicting testimony are subject to the manifest error standard. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). In this case, however, we find that he was clearly wrong in assessing fifty-percent responsibility to DOTD.
We therefore reverse that judgment against DOTD and in favor of Hollie Guillie on behalf of herself and her minor son, Edward, and in favor of Tina Ronquille on behalf of her minor daughter, Brandy; and we dismiss the proceedings against DOTD. Since we have absolved DOTD of liability for Guillie’s accident, we do not reach the other issues urged by it on appeal. Holly Guillie and Tina Ronquille must pay the costs of this appeal.
REVERSED.