STOKER, Judge.
This is a wrongful death suit and a survival action arising from a one-car accident which occurred at Winn Street underpass in Alexandria, Louisiana on February 3, 1987. Charlie Louis Holloway was killed when riding as a guest passenger in an uninsured automobile owned by Love Johnson and driven by David Dorsey. Dorsey’s vehicle left the roadway, traveled 124.9 feet on the median and struck a concrete pier which supports the railroad track overpass between Winn and Fulton Streets. The parties stipulated at trial that David Dorsey had a blood alcohol concentration of .29 at the time of the accident.
Kimberly Irene Holloway Cox brought this suit on behalf of her minor son, Jonathan Adam Holloway. The trial judge held in favor of plaintiff, awarding $25,000 for plaintiff’s loss of love,- affection and companionship and $5000 for decedent’s pain and suffering prior to death. In apportioning fault, the trial judge held that Dorsey was 90% at fault for causing the accident and the D.O.T.D. was 10% at fault. The trial judge then reduced plaintiff’s recovery by 50% for the decedent’s negligence in riding with an intoxicated driver.
Plaintiff appeals the judgment of the trial court, assigning as errors the trial court’s allocation of fault, the trial court’s finding of contributory negligence on the part of the deceased, the quantum and the allocation of payment under LSA-C.C. arts. 2323 and 2324. We affirm.
OPINION
The assignments of error set forth by the plaintiff were fully discussed by the trial judge in his excellent reasons for judgment. After an exhaustive review of the record, this court affirms the judgment of the trial court for the reasons given in the trial court’s written reasons for judgment which are attached hereto as Appendix A. For other eases which support the holding of the trial court, see Molbert v. Toepfer, 550 So.2d 183 (La.1989); Guillie v. State, D.O.T.D., 554 So.2d 812 (La.App. 5th Cir.1989); Smith v. Roussel, 554 So.2d 776 (La.App. 5th Cir.1989); Alford v. Estate of Zanca, 552 So.2d 7 (La.App. 5th Cir.1989); Townley v. Manuel, 509 So.2d 515 (La.App.3d Cir.1987); Gravois v. Succ. of Trauth, 498 So.2d 140 (La.App. 5th Cir.1986), writ denied, 500 So.2d 422 (La.1987); Holmes v. State, through Dept. of Highways, 466 So.2d 811 (La.App.3d Cir.), writ denied, 472 So.2d 31 (La.1985).
CONCLUSION
Accordingly, for the reasons given, the judgment of the trial court is affirmed. Costs of this appeal are assessed to plaintiff-appellant.
AFFIRMED.
*1035 APPENDIX A
REASONS FOR JUDGMENT
This is an action for wrongful death on behalf of the minor child, Jonathan Adam Holloway, for damages arising out of the death of his father, Charlie Louis Holloway. Decedent died as a result of injuries received in an automobile accident which occurred in the early morning hours of February 3, 1987 in the City of Alexandria, Rapides Parish, Louisiana. On the date of trial, plaintiff amended his petition to include physical and mental pain and suffering incurred by Charlie Holloway prior to his death.
The decedent died from injuries received in a one vehicle accident when an automobile being driven by David Dorsey entered a grass median located between Winn and Fulton Streets in Alexandria, traveled approximately 125 feet on the grass median and crashed into a concrete abutment or pier located in the median under a railroad overpass. Decedent was riding as a guest passenger in the right front seat of the vehicle at the time of the accident. Neither the driver nor three passengers in the rear of the vehicle were seriously injured in the accident. Made defendants were the State of Louisiana, Through the Department of Transportation and Development (State) and the driver of the vehicle, David Dorsey, (Dorsey).
Winn and Fulton Streets are parallel, separated by a city block. They run in a generally east/west direction, with Winn Street being one way going west and Fulton Street being one way going east. In the area of the accident, the streets converge at a railroad underpass. On either side of the underpass the streets are separated by a more or less triangular shaped grass covered median. Beneath the railroad tracks the streets are separated by a concrete pier, which supports the tracks. The pier is located approximately four and a half feet from the traveled portion of the streets on either side. Approaching the underpass on Winn Street from the east it is necessary to negotiate an “S” or reverse curve, turning first to the left and then to the right. Also, while negotiating this reverse curve, the grade of the roadway is descending so that as the vehicle turns first left and then right, it is also going down, and continues going down after negotiating the curves until it is beneath the railroad tracks, at which time it begins to ascend. (See Exhibits P-8B, C, & D) In the instant case, the Dorsey vehicle made the left turn, partially made the right turn, went onto the grass median where it continued for approximately 125 feet before striking the concrete abutment separating the two roadways. At the time of impact, the vehicle was totally within the median and was apparently turned slightly to the right, as the left front of the vehicle received the most severe damage.
It was stipulated that at the time of the accident Dorsey had a blood alcohol content of 0.29. According to the experts for both plaintiff and defendant, (Dr. George M. McCormick, II for plaintiff and Mr. Jimmy Barnhill for State) the average person with that blood alcohol content would be semi-comotose, if conscious at all. Dorsey testified that he had no recollection of the accident, his last recollection being stopped for a red light some five or six blocks before the accident scene. He also testified that he thought he had been knocked unconscious by the accident as he had no memory of being at the accident scene. However, the officers who investigated the accident clearly recall Dorsey hollering for help until he was removed from the car. Dorsey acknowledged that he was familiar with the roadway at the scene of the accident, having driven through the reverse curve and under the railroad tracks on numerous occasions before the night of the accident.
The officer who investigated the accident testified that he could plainly see the tire marks of the vehicle on the grass median and that there was no evidence that the driver applied his brakes or took any evasive action prior to the accident other than perhaps a slight turn to the right immediately prior to the impact.
The area of the accident is located within the city limits of Alexandria, Louisiana, and the posted speed limit on these two streets is 35 miles per hour. In addition, *1036 there is a posted sign warning of the upcoming S curve with an advisory speed of 30 miles per hour. Chevron or arrow-type signs are posted prior to the entry of each of the curves. Approximately 35,000 to 38,000 vehicles per day pass under this underpass in both directions, making it one of the highest traffic volume areas in the Eighth Louisiana Highway District.
Plaintiff contends that the highway design was unreasonably dangerous, thus being a contributing cause of the accident and that the concrete abutment presented an unreasonably dangerous hazard which should have either been protected or removed, and that because of one or both of these conditions, the State is responsible to the plaintiff in damages. In support of its position, plaintiff relies upon the testimony of Dr. Oían H. Dart, Jr., who has been accepted as an expert in the Ninth Judicial District Court on many occasions. In fact, Dr. Dart testified in the recent case of Rachal v. State of Louisiana, Through the Department of Transportation and Development, 505 So.2d 999 (La.App.3d Cir.1987) involving an accident very similar to this accident at the exact same location. As he did in the Rachal case, Dr. Dart was of the opinion that the reverse curve on the down grade with the concrete pier in the median at the bottom of the down grade presented an unreasonably dangerous condition, and that this should have been corrected either by removing the concrete pier at the bottom of the down grade or providing guardrails or attenuators to protect against vehicles striking the pier with great force. Although he made no specific study of the speed of the automobile at the time of the accident and he indicated that it would be difficult to tell, it was his opinion, after a review of the photographs of the vehicle that it was traveling no more than 35 to 40 miles per hour at the time of the accident.
Dr. Dart further testified that a safe speed for adverse conditions would be 30 miles per hour in the left hand lane and 35 miles per hour in the right hand lane. However, on further questioning, he indicated that these would be safe speeds on wet pavement, which was not this case. Dr. Dart calculated that a skilled, prudent driver would have no problem negotiating the curves at 59.4 miles per hour from the left hand lane of traffic and at 61.8 miles per hour from the right hand lane of traffic.
This accident is in all pertinent respects identical to the accident considered by another division of this Court in Rachal, supra. In both cases the driver of the vehicle was highly intoxicated, made the first curve of the reverse curve to the left and then partially made the curve to the right, ran off the road onto the median and struck the fixed concrete abutment beneath the railroad tracks. In the Rachal case the driver was killed. In the instant case his guest passenger was killed. In Rachal, Judge Culpepper, sitting ad hoc in a division of the Ninth Judicial District Court found that a combination of the reverse curve on a down grade together with an unprotected fixed, immovable object at the bottom located only four feet from the roadway constituted an unreasonably hazardous condition which was a cause in fact of the accident. The Third Circuit Court of Appeal affirmed this decision and adopted the written reasons given by the trial court as reasons for its affirmation. As the evidence in this case, and particularly the testimony of plaintiffs expert witness is basically the same, the Court concludes that to a large extent the Rachal decision is the law of this case.
A difference in the evidence of this case is the testimony of Dr. Joseph David Blaschke, an expert in traffic safety who testified on behalf of the State. Dr. Blaschke disagreed with Dr. Dart’s finding that the design and construction of the reverse curves was unreasonably dangerous. He pointed out that this was an urban, low speed area and that the design and construction of the streets were reasonably safe for the city traffic. Dr. Blaschke pointed out that the design standards relied on by Dr. Dart pertain to high speed rural highways and were not appropriate for urban streets with a posted *1037 speed limit of 35 miles per hour and an advisory speed limit of 30 miles per hour approaching the curves. He also felt that the posted warnings and advisory speed were adequate for persons exercising reasonable use of the street.
The Court can certainly ascribe to such reasoning. Our courts have repeatedly held that the State is not a guarantor of the safety of travelers, but rather, owes a duty to keep it’s highways and shoulders reasonably safe for non-negligent motorists. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980). It has even been inferred that the duty of the State extends to negligent as well as non-negligent motorists. Efferson v. State, Through the Department of Transportation & Development, 463 So.2d 1342 (La.App. 1st Cir.1984) writ den., 465 So.2d 722 (La.1985), Rue v. State, Through the Department of Highways, 372 So.2d 1197 (La.1979). However, the negligence of the driver spoken of in these cases refers to inadvertent momentary lapses of concentration which can be expected to occur in all drivers from time to time in the otherwise reasonable use of our highways. In such situations, the driver should be able to anticipate that the highway is safe enough to forgive his inadvertance or momentary distraction.[1] This duty does not extend to the driver whose use of the highways is abusive and reckless even though there is the certainty that such drivers will use the highways. Certainly no one could argue that the State can realistically make its highways safe for the driver who is incapacitated by intoxication, who drives at an excessive speed on roadways designed for slower, urban traffic or for any operation of a vehicle that demonstrates a reckless disregard for the posted conditions and limitations of the highway. The determination of whether the design, construction and maintenance of a highway is safe or hazardous has to be judged in light of the purpose and posted limitations imposed on the use of such highways.
In the Rachal case the State failed to introduce any evidence of the nature of that testified to by Dr. Blaschke. Whether the inclusion of such evidence would have made a difference in that Court’s opinion is speculation at this point. Nevertheless, the Rachal decision did specifically direct the State to protect the concrete pier situated four feet from the traveled portion of the roadway by the use of guardrails or attenuators to prevent severe impact on the immovable concrete pier. The accident in the Rachal case occurred in 1981 and the trial court’s opinion was rendered in the latter part of 1985. The instant accident occurred in February of 1987 and no sort of protection was installed by the State until shortly before the trial of this matter in 1988. Dr. Dart testified that guardrails are designed to give, whereas the fixed concrete abutment would not. He stated that a car striking the guardrail would have a tendency to slide along the rail and avoid striking the pier, thereby greatly minimizing the seriousness of potential accidents in the area. He agreed with Dr. Blaschke that a guardrail would increase the number of accidents in the area but felt that the trade off of more accidents for less severe accidents was justified. Dr. Blaschke while generally agreeing with the potential for more accidents against less severe accidents could only conclude that the installation of a guardrail presented a gray area in this location. It is the opinion of the Court that the State’s failure to install any sort of protective device after having specific notice that the unprotected pier was an unreasonable hazard, was a cause in fact of the accident which claimed the life of the decedent. While there is no doubt, and it was the unanimous opinion of the experts, that an accident would have occurred even with a guardrail or protectors in place, it is the Court’s opinion that this particular accident which claimed the life of the decedent, would have been avoided.
The negligence of the driver, Dorsey, is self evident. The operation of a *1038 vehicle with a 0.29 blood alcohol content speaks for itself. A warning of the reverse curve and advisory speed were adequately posted. Even if otherwise, Dorsey was familiar with the physical characteristics of the road, having driven it many times. There is no evidence that Dorsey was speeding excessively; both experts agreeing his speed to be no more than 35 to 40 miles per hour at time of impact. The evidence reflects that he neither put on his brakes nor took any evasive action while traveling 125 feet on the median before impact. It appears that immediately prior to the accident Dorsey was either passed out or so semi-comotose as to be unaware of what he was doing. There is no question but that his fault was a major cause of the accident. As did the Court in Rachal, this Court finds the driver- to be ninety (90%) percent at fault and the State to be ten (10%) percent at fault in causing the accident.
The next inquiry is what degree of fault, if any, is the decedent responsible for his own death. Until recently in Louisiana law to knowingly ride with a drunk driver was held to be an assumption of the risk involved and was an absolute bar to any recovery for damages occasioned by the taking of such risk. With the adoption of the comparative fault system in this State and specifically, under the decision of the Louisiana Supreme Court in Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988) the doctrine of assumption of risk is no longer viable in Louisiana. Accordingly, whether the decedent’s act of riding with a drunk driver is labeled as contributory negligence or an assumption of the risk it is necessary to determine the degree of fault for which the decedent was responsible for his own death.
As was previously noted, Dorsey had a blood alcohol content of 0.29 shortly after the accident. Plaintiff introduced the testimony of Dorsey, the driver, and of Carl Patrick, Michael Collins and Robert Stewart (the latter through deposition) to establish that Dorsey was not noticably drunk prior to the accident. However, there are enough evasions and inconsistencies in their testimony as to make them unworthy of belief on this point. The three passengers who were riding in the back seat at the time of the accident testified that they met up with the decedent and Dorsey between 11:30 P.M. and 1:00 A.M. on the evening before or morning of the accident. Dorsey’s recollection was that they all got together between 8:00 and 9:00 P.M. All three testified that after they got in Dorsey’s car they went to a Texaco station where they purchased four cans of 45 oz. beer and the ones in the front (Dorsey and the decedent) purchased some gin. Dorsey, the driver, has no recollection of going to the Texaco station. At least one of the witnesses in the back seat observed Dorsey and the decedent drinking gin from the bottle as they were riding in the vehicle. Dorsey denies having purchased or drunk any gin. Carl Patrick testified that he did not observe how Dorsey was driving and Michael Collins, who felt Dorsey was driving o.k., acknowledged that he personally was very intoxicated, too drunk, to have been driving himself.
Dorsey testified that he met the decedent about 5:30 P.M. the evening preceding the accident at which time they played basketball for about two hours. Thereafter they went riding around and met the other three at approximately 8:00 or 9:00 P.M. He had one or two beers with them at which time they all left to go to a nightclub. He remembered stopping at a store and buying four beers which they all shared, and denies having any drinks at the nightclub. He recalls leaving the nightclub and stopping at a red light five or six blocks prior to the accident scene. He has no recollection of anything after that until being in the hospital after the accident. He acknowledged that his blood alcohol content was measured at 0.29 and he pled guilty to a charge of negligent homicide. As noted previously, the medical experts agree that at this level of blood alcohol content, Dorsey should have either been semi-comotose or unconscious. At the *1039 least he was staggering drunk. Under these circumstances, the Court can only conclude that Dorsey was noticeably intoxicated at the time the decedent and the other passengers entered Dorsey's vehicle and permitted him to drive them to their next destination. Decedent, who was with Dorsey continuously since 5:30 P.M. in the afternoon preceeding the accident was obviously aware of his intoxicated condition. Under these circumstances, decedent’s negligence is a causative factor in his resulting death. The Court finds his fault to be fifty (50%) percent of the cause of his death.
Plaintiff in this case, Jonathan Adams Holloway, is the son of the decedent, Charlie Holloway. Plaintiff was born May 1, 1984 and was not quite three years old at the time of his father’s death. Contact between plaintiff and his father during those three years was minimal. Plaintiff’s parents, both members of the United States Marine Corps, were married while stationed in Alaska on October 22, 1983. They separated while living in Alaska, but reunited while both were stationed at Camp LeJeune, North Carolina when they learned of Mrs. Holloway’s pregnancy. Jonathan was born on May 1, 1984 and the parties again separated in fact in July of 1984. There is testimony that the decedent visited his son every weekend from July 1984 until he was discharged from the service in June of 1985. The decedent returned to his home in Alexandria, Louisiana after discharge and there was no further personal contact with his son. Plaintiff's mother testified that she had telephone contact with the decedent fairly frequently before his death in which he would always ask about his son. The last such call was in April of 1986 when plaintiff was approximately 2 years old. This call was originated by her. She remarried in December of 1986 and the plaintiff has resided with her and her new husband since that time.
In the divorce between plaintiff’s parents, the decedent was ordered to pay $250.00 per month as child support, which amount was set by agreement. Nevertheless, decedent paid this only once, that being the first month following the child support decree, while he was still in the service. Plaintiff’s mother stated that after decedent’s discharge she realized he was unemployed and never made demands upon him to pay any more.
There’s evidence in the record that the decedent was proud of his son and boasted of him to his mother and friends. However, there is no evidence that plaintiff had any relationship with his father and, in fact, in the three years prior to his father’s death had only received one gift from his father; this being a plastic toy of the kind found in cereal boxes, which decedent included in a letter to plaintiff’s mother.
It is the opinion of the Court that the plaintiff had only a minimal relationship with his biological father with no reasonable expectation of it growing. Furthermore, even though the decedent had a legal and judicial obligation to provide support for plaintiff, it is the opinion of the Court that plaintiff had no reasonable expectation of receiving such support. It is the opinion of the Court that $25,000.00 will adequately compensate plaintiff for loss of love, affection, companionship and guidance as well as loss of past and future support which plaintiff might suffer as a result of the death of decedent.
At the trial, plaintiff amended his petition to ask for damages suffered by the decedent prior to his death. The evidence reflects that decedent was still breathing when the police first arrived on the scene. However, the evidence further reflects that the decedent was unconscious at the time the guest passengers observed him immediately after the accident until his death at the hospital some sixty minutes later. In compensation for any pain and suffering decedent may have endured during this short span of life and for the pre-impact emotional trauma decedent may have suffered, the Court awards the sum of $5,000.00.
It now becomes necessary to consider the effect of the apportionment of fault among the various parties as set forth above. The Court found the State ten (10%) percent at fault and Dorsey ninety (90%) at fault in *1040 causing the accident. The Court found the decedent fifty (50%) percent at fault in causing his own death. This seemingly adds up to one hundred and fifty (150%) percent fault. Obviously, the decedent’s fault, i.e. knowingly riding with a drunk driver, was not a cause in fact of the accident. Prior to the comparative negligence system decedent would have been held to have assumed the risk of his own injury and his recovery would have been barred. Our Supreme Court, in Murray v. Ramada Inns, Inc., (Supra) held that in this type of case, and with the advent of comparative fault, ... “It was more accurate to conclude that such plaintiffs negligently disregarded a known risk or, in other words, were contributorily negligent.” (Murray, pg. 1131) The problem is, does the “risk” relate to the accident or to the injury. As noted above, the risk taking is not a cause in fact of the accident — but is a causative factor of the injury. Where the fault of only one party is the cause of an accident there is no need to make the distinction, as the result is the same, i.e. the plaintiff’s recovery is reduced by his percentage of fault and the lone defendant whose fault caused the accident is responsible for the balance. A distinction is necessary where the concurring fault of two or more defendants causes the accident because then the inquiry is focused on the cause of the accident and not merely on the reduction of damages. In this case, the accident was caused by the concurring fault of the State (10%) and Dorsey (90%). Whereas decedent’s fault obviously did not contribute to the accident, it did, just as obviously, contribute to his own death. Such a conclusion seems compatible with our comparative negligence laws.
Under C.C. Art. 2323 the damages recoverable by plaintiff ...
“shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.”
Accordingly, in this case, plaintiff’s damages are reduced by fifty (50%) percent. The payment of this reduced recovery by the co-defendants, who jointly caused the accident, is governed by C.C. Art. 2324. Under the provisions of this article (prior to the 1987 amendment) the obligation of the defendants is in solido. However, as the State’s degree of fault is less than that of the decedent, its obligation for payment is ten (10%) percent of the reduced damages. Dorsey’s obligation for payment of the reduced damages is in solido — for the whole. His virile portion is ninety (90%).
The Court fixes expert witness fees for Dr. Dart and Dr. Blaschke, who testified at the trial, at $500.00 each. The expert fees of Dr. McCormick and Jimmy Barnhill, who testified through deposition, are set at $200.00 each. Said fees to be taxed as costs. Defendants are cast for all costs.
Alexandria, Louisiana, this 14th day of September, 1988.
/s/ Lewis O. Lauve LEWIS O. LAUVE DISTRICT JUDGE DIVISION “F”

. As suggested by Judge Stoker, concurring in Holmes v. State, Department of Highways, 466 So.2d 811 (La.App. 3rd Cir.1985), this distinc *1038 tion should no longer be necessary since enactment of our comparative fault system.