FRUGÉ, Judge.
This is a wrongful death action resulting from an electrocution. Plaintiff, the mother of the deceased, Ronald Lee O’Neal, also known as Ronald Lee Brannon, filed this suit as a result of the alleged wrongful death of her son on the premises of Ba-bin’s Vermilion Flyers, a business concern owned by Daniel Babin, the defendant herein.
At the institution of the suit, the insurers of Babin’s Vermilion Flyers were brought into the suit by both plaintiff and defendant. The insurers filed motions for summary judgment, which motions were sustained by the trial court, and they were dismissed from the suit. After trial on the merits, the court rendered judgment in defendants’ favor. From this judgment the plaintiff has appealed, and both plaintiff and defendant appeal from the release of the insurers.
The basic facts surrounding the death of Ronald Lee Brannon are not in dispute. Plaintiff’s son was employed by defendant, Daniel Babin, as a helper for the ground crew maintained by Mr. Babin for servicing aircraft used by him in his business. Ronald’s duties were minor in nature and consisted mainly in doing whatever odd jobs or errands that were assigned him. His employment with Babin had begun approximately two weeks prior to the date of the accident, and it was supposed to terminate the day of the accident.
The evidence reveals that shortly before twelve o’clock noon on September 7, 1966, the day in question, Ronald appeared at the office of appellee’s bookkeeper and he received his check for wages earned to date. Shortly thereafter, he went to the home of a friend, Virgil Lynn Hebert, with whom he had lunch. Sometime in the neighborhood of 12:30 p. m., the two boys drove their automobiles to Babin’s place of business to wash them. Located on the premises used by defendants in conducting his business was a washing machine, electrically operated, which Babin used to wash chemicals from his aircraft.
Hebert testified that when the two boys arrived at Babin’s place of business they parked their cars near a small storage shed adjacent to the airstrip. This shed contained the washing machine and extension cords. Ronald went into the storage shed and came out with the electrically operated washing machine which he mounted on a barrel near the corner of the shed. He then proceeded to make all the necessary connections for both water and electrical power, and installed such detergent as was required in the operation of the machine. The boys first washed the Hebert vehicle, following which Ronald began to wash his own. After the Hebert boy had completed the washing of his automobile, he went a short distance to a local store to get soft drinks for both of them, and upon his return to the airstrip he told Ronald that he was going into the office and that Ronald should follow him to get his drink. When he noticed that Ronald had not appeared, *338 Hebert walked outside and observed Ronald lying on his back, face up, with the long nozzle of the washing machine across his chest. Hebert touched Ronald and, upon feeling a slight shock, unplugged the machine, put Ronald in his automobile, and drove him to a hospital. Upon arrival, Ronald was pronounced dead, the coroner’s report showing death by electrocution.
Of primary importance to this case is the type of electrical connections found on the washing machine, for its malfunction is alleged to have caused Ronald’s death. The device itself, powered by electricity, was utilized to spray, under pressure, a soap and water solution. Leading from the washing machine was a combination hose and electrical wire, to the end of which was attached a power nozzle with an electrical switch. Leading from the machine to the power source was a variety of type connections. First, a three-wire electrical cord, the third wire being what is commonly known as a “safety ground wire”. Next, this cord was plugged into an “adapter”, a device which converted the three-prong arrangement into a two-prong, there being no three-prong receptacles in the shed. Lastly, an extension cord plugged into the wall receptacle. The adapter would enable a user to plug the adapter into a two-prong receptacle or extension cord, thus eliminating the third “ground” prong, by replacing it with a “small, green wire” leading away from the “adapter”. Allegedly attached to this little green wire was an uncertain length of wire supposedly used as a ground wire in lieu of the third prong absent in the extension cord used between the “adapter” and the wall receptacle. Although this wire was present the day of the accident, for some reason it became lost prior to trial. It was the testimony of numerous witnesses that the wire was present at the time of the accident or shortly thereafter, and obviously the lower court accepted the version of the testimony supporting the existence of the wire.
During the trial of the matter, electrical experts were called to testify in an attempt to explain the reasons for Ronald’s death. In an unscientific manner, this court will attempt to summarize the testimony of the experts. It seems that the purpose of having the “third-wire safety ground”, was to allow an outlet for misdirected electrical power away from potential injury or death of the user back toward the power source, and eventually to the ground where it could be safely dissipated. In the absence of a continuous connection between the ground and all of the metallic parts of the machine and its nozzle, a potentially dangerous situation could be created should the machine have a short circuit or other electrical malfunction.
It was the testimony of all the experts that the cause of Ronald’s death was the lack of sufficient grounding of the machine. The only one of the experts who actually took the machine apart testified that it was in good working order, and that evidently it was only the manner in which it was used that day that caused it to be dangerous.
There was no evidence that the machine had been grounded, or that the warning on the machine, “Ground the Machine Before Using”, had been heeded. Instead, the evidence revealed that the most likely explanation for the electrocution of deceased was that the adapter fell into some water and that in some way the metallic parts of the machine, especially the nozzle, became “hot” or charged, thus electrocuting its holder.
The trial court awarded judgment in favor of defendant. The judge did not assign specific oral reasons for that judgment, but instead adopted defendant’s trial brief as his reasons. The judgment of the trial court was evidently based on its evaluation of the testimony of the witnesses, and in the absence of manifest error, we shall have to sustain that judgment. Lewis v. Liberty Mutual Insurance Company, 215 So.2d 138 (La.App.3d Cir., 1968) and citations therein.
As a basis for the reversal of the trial court’s opinion, plaintiff alleges that the *339 evidence establishes her right of recovery-under two possible theories. The first is that of the applicability of res ipsa loqui-tur, and the second is that of simple negligence.
Defendant, on the other hand, contends that the trial court was correct in its determination of the case in that the evidence clearly reveals the absence of negligence allowing plaintiff a cause, or in the alternative, the deceased’s assumption of risk and/or contributory negligence.
1. RES IPSA LOQUITUR.
The doctrine of res ipsa loquitur is a rule of evidence peculiar to the law of negligence and is an exception to the general rule that negligence must be affirmatively proved. The phrase “res ipsa loqui-tur” literally means “the thing speaks for itself”. Thus, when an accident occurs causing injury, and it is shown that the instrumentality which caused the accident was under the control of the defendant and that the accident was such as would not have occurred in the ordinary course of things, if the one having control had used proper care the injury is presumed to have been caused by defendant’s negligence and the burden of proof is on the defendant to exculpate himself from fault. Great American Indemnity Company v. Ford, 122 So.2d 111 (La.App.2d Cir., 1960).
Plaintiff argues strongly that the doctrine should be applied here, and once applied, would furnish plaintiff sufficient cause for collection. With this contention we simply cannot agree. As this writer noted in the case of Lejeune v. Collard, 44 So.2d 504 (La.App.1st Cir., 1950), the applicability of the doctrine is clearly prohibited where the accident might have occurred through the negligence of the plaintiff as easily as through that of defendant.
In the present case, the deceased himself did not heed the warning clearly printed on the machine, and therefore did not properly ground the machine. Furthermore, the deceased was using it out of the presence of defendant and apparently without the defendant’s knowledge. For that reason we feel that this is one of those cases wherein the deceased would be in the best position to explain how and why the accident happened, and therefore the doctrine is unavailable.
2. NEGLIGENCE.
As a second basis for recovery, plaintiff alleges that her son should have been accorded the protection owed to one having the status of an “invitee”. In view of the fact that defendant was under the impression that deceased had completed his employment and had left the premises, and further, that deceased did not have permission to enter the storage shed and to use the machine, we do not feel that deceased was owed the duty of an “invitee”. Taking plaintiff’s case in its best light, however, we shall discuss whether, considering deceased an invitee, defendant breached the duty owed.
The duty owed to an invitee has been defined as that of reasonable and ordinary care. It includes the prior discovery of reasonable discoverable conditions on the premises, which may be unreasonably dangerous and the correction thereof or a warning to the invitee of the danger. Alexander v. General Accident Fire and Life Assurance Corporation, 98 So.2d 730 (La.App.1st Cir., 1957).
In line with the principles noted above, it was incumbent upon the defendant to discover, if reasonably discoverable, and to correct any unreasonably dangerous conditions on his premises or to warn the deceased of the danger. The evidence reveals no breach of this duty on the part of defendant.
Defendant had no knowledge of any previous episodes of difficulty with the washing machine. Furthermore, the testimony of the experts indicates that the machine, as used by defendant, was in proper working order and was safe. It is *340 true that there was some change in wiring, but the defendant had furnished the ma chine with sufficient mechanisms to prop erly ground it. Even beyond this, the machine had placed upon it a warning to all users of the need for grounding. There being nothing to discover or to correct, we cannot say that defendant breached the duty owed the deceased to warn or correct “reasonably discoverable dangerous conditions.”
Plaintiff alleges negligence on the part of Daniel Babin by his alleged failure to comply with certain of the practices announced in the National Electrical Code [1], and L.S.A.-R.S. 40:1603.[2]
After a reading of the record, we find ourselves forced to agree with defendants that there was no violation of the Code or the statute cited. The defendant did furnish the machine with adequate grounding mechanism, and the machine itself announced sufficient admonition, to constitute compliance with the Code and the statute. It was only the failure on the part of the deceased to ground the equipment with the mechanism provided for such grounding, and by so doing comply with the warnings on the machine, which was the cause of his death.
In support of her allegations of negligence, plaintiff cited to the court a number of cases which she alleged to be similar. Cited were the cases of Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 880, 84 So.2d 445 (1955); Tassin v. Louisiana Power and Light Company, 191 So.2d 338 (La.App.3d Cir., 1966); Bynum v. City of Monroe, 171 So. 116 (La.App.2d Cir., 1936) and Younse v. Southern Advance Bag and Paper Company, 159 So. 611 (La.App.2d Cir., 1935).
After a close reading of the cases, wé believe that all but the Younse case are so easily distinguished they need not be discussed. The Younse case is as well distinguishable in view of the fact that there the defendants had given permission, if not commanded the injured party, to start the electric motor that caused him harm. Further, due to heavy rains having affected other electric motors in the plant, the defendants were aware of the defect in the motor and their failure to check and correct such was definitely negligence on their part. The decision is imminently correct and proper on its facts.
3.CONTRIBUTORY NEGLIGENCE.
Since we have found the absence of negligence or the applicability of the doctrine of res ipsa loquitur to the actions of defendant, a discussion of contributory negligence or assumption of risk is unnecessary.
In summary of the evidence, we find that at the time of the accident the deceased was in full control of the electrical machinery. He could have, had he exercised due care, fully prevented the accident and his ensuing, death. There is no basis on which to hold the defendant negligent in that we feel that he did all that he could have in view of the situation. The case is indeed a sad and unfortunate one, and the Court has sympathy for the plaintiff in her loss, but in view of the facts and the law being in his favor, we are constrained to rule for defendant.
For the foregoing reasons, the judgment in defendant-appellee’s favor is hereby affirmed. Costs to be paid by plaintiff-appellants.
Affirmed.

. National Fire Protection Association. National Electrical Code — 1965 (Boston, 1965).

. “All electrical wiring and devices in any structure, watercraft or movable shall be installed in compliance with the latest edition of the National Electrical Code and approved by a licensed electrician. All appliances shall be approved by the Underwriters Laboratory.”