563 So.2d 1179 (1990)
Marcus MANUEL
v.
ODECO, INC., Southern Scrap of Morgan City, Inc., Steel Processing Services, Inc., and U.S. Fire Insurance Company.
No. 89 CA 0690.
Court of Appeal of Louisiana, First Circuit.
May 30, 1990.
Writ Denied September 14, 1990.
*1180 Sue Fontenot, Abbeville, for Marcus Manuel.
James F. Shuey, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, for Odeco, Inc.
Patrick F. Lee, Ward & Clesi, New Orleans, for intervenor U.S. Fire Ins. Co.
St. Paul Bourgeois, IV, Lafayette, for Steel Processing Services & Southern Scrap of Morgan City (third party defendants).
Jan P. Jumonville, Ward & Clesi, New Orleans, for U.S. Fire Ins. Co. (intervenor) and Westchester Fire Ins. Co.
Before COVINGTON, C.J., and WATKINS and DOHERTY, JJ.[*]
WATKINS, Judge.
The victim of an industrial accident brings this appeal to urge that the trial court's judgment, based on a jury's finding of statutory employment, is erroneous as a matter of law and that the jury's exoneration from liability of an alleged former owner of a piece of oil field equipment is clearly wrong. The plaintiff also contends that newly discovered evidence relating to the piece of equipment entitled him to a new trial.
We affirm. Even if we were to rule in plaintiff's favor on each of the numerous errors he asserts, including the newly discovered evidence, judgment in favor of both defendants is mandated by the record. Our decision on the merits of plaintiff's claim would be no different from the trial court's.
On October 7, 1985, plaintiff, Marcus Manuel, sustained severe injury to his dominant arm in an explosion at the facility of defendant, Southern Scrap of Morgan City, Inc. (Southern Scrap), in St. Mary Parish, Louisiana. Plaintiff was employed by Steel Processing Services, Inc. (Steel Processing) as a "burner." Plaintiff's employment duties were to cut scrap material with an acetylene torch. On the morning of the accident, Mr. Manuel approached a large, closed tank marked with the name "ODECO" and the word "JUNK"; there were no other markings on the tank. He was applying the torch flame to the side of the tank when it exploded.
Compensation benefits and medical expenses were paid to plaintiff by intervenor, Westchester Fire Insurance Company (Westchester), on behalf of its insured, Steel Processing.
Mr. Manuel sued Odeco, Inc. (Odeco), alleging its strict liability as the owner/custodian of the tank (LSA-C.C. art. 2317) and its gross negligence in the handling of hazardous materials (LSA-C.C. art. 2315.3). He also sued Southern Scrap, alleging its strict liability as the possessor/custodian of the tank and its gross negligence in the handling of hazardous materials.
Odeco defended on the basis of having divested itself of the ownership and custody of the tank. Southern Scrap claimed immunity from tort liability on the basis of *1181 its status as plaintiff's statutory employer. The jury found in favor of both defendants, answering "No" to the interrogatory concerning Odeco's fault or negligence; answering "Yes" to the interrogatory concerning statutory employment. The trial court rendered judgment pursuant to the jury verdict, dismissing not only plaintiff's claim but also Westchester's intervention and a third party demand for indemnification filed by Southern Scrap against Steel Processing.

SOUTHERN SCRAP
Southern Scrap has been in the scrap iron business for over 25 years. The Louisiana company's only business is to process objects for scrap. Within the recycling chain, Southern Scrap occupies the position of first processor. It procures, mainly from oil drillers, objects suitable only for scrap, and it demolishes or reduces them into pieces small enough to be readily handled. The scrap is then graded and loaded onto barges at Southern Scrap's facility in St. Mary Parish. Eventually it is sold and shipped to sundry locations for further processing into objects of similar or dissimilar nature. The testimony at trial was that the tank involved in this case "could now be a Toyota."
The task of making small pieces of metal from big pieces of metal is accomplished by two methods: the acetylene torch method, which the plaintiff described as merely striking up the torch and allowing the flame to melt and burn through the metal; the hydraulic shearer method, which utilizes a guillotine-type machine that slices large pieces of metal into small pieces of metal. Southern Scrap's direct employees used both methods; Steel Processing's crew handled only the acetylene torches and not the hydraulic shearer.
Mr. Bernie Hunter, Southern Scrap's vice-president and general manager, testified about the company's business decision to utilize labor contractors such as Steel Processing. The purpose was to keep Southern Scrap's labor force on a steady level and yet to be able to process the items purchased by Southern Scrap which came in "in spurts." The sporadic flow of materials, Mr. Hunter explained, "causes your own labor force to be busy, busy, busy and then the next week you're looking for something for them to do...." With Steel Processing hired to supplement the labor force, Southern Scrap could hold down the number of persons on its payroll. "If it rains, then it's incumbent upon the contractor to let his people go home and you can keep your people busy; or if there is not much material, you can tell the contractor, `I don't have much for you this week,' and then it's incumbent on him to let people go or have 5 people today, 10 people tomorrow."
Mr. Manuel was a direct employee of Steel Processing for approximately two years prior to the accident; he worked only at Southern Scrap's facility, and he performed only the duties of a burner. Steel Processing and its local supervisor, Kenneth Medley, and initially all of its burners were paid per ton of scrap processed. However, when Mr. Medley changed the method of paying the burners, Mr. Manuel received $50.00 per day cash. There was no formal payroll. Weather permitting, Mr. Manuel normally worked five days per week. He admitted that learning his job at Southern Scrap's facility took no more than a week, with no special training.
Whenever the statutory employment defense is raised, the method of analysis to be used in resolving the difficult question is the three-level analysis provided in Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986).
The first level focuses on the scope of the contract work to determine whether it is specialized or non-specialized. In the instant case the contract work was to process scrap materials into smaller sizes by "burning." Although the job may have been physically demanding, it was an easily learned task which required no special skill, training, experience, or education. Steel Processing's crew was not performing precision welding but was merely using torches to cut metal into smaller pieces. From the evidence presented at trial it appears that Mr. Manuel's claim to specialization *1182 is not as strong as the experienced boilermaker and code-certified welder in Poirrier v. Cajun Insulation, Inc., 459 So.2d 737 (La.App. 4th Cir.1984) who, because his employer's contract was for manual labor, was determined to be a statutory employee. Accordingly, we conclude that Steel Processing's contract work was not specialized per se.
Having determined that the contract work was nonspecialty work, we now turn to the second level of the Berry test: comparing the contract work with Southern Scrap's principal trade or business. In the instant case the contract work was identical to the principal trade of Southern Scrap. Southern Scrap hired its direct employees to cut "raw" scrap into processed scrap; Steel Processing hired its direct employees, including plaintiff, to cut "raw" scrap into processed scrap. The occupation of employees of both companies was one and the same. Whether other scrap companies usually contract out this work is not determinative. Rigid application of the detailed points of this level of the Berry test would fly in the face of the obvious factual conclusion mandated by the circumstances of the instant case.
Finally, we conclude that Southern Scrap was engaged in the trade of processing scrap at the time Mr. Manuel was processing scrap as a direct employee of Steel Processing. Although plaintiff argues that Southern Scrap's burners were burners in name only and were actually performing other tasks, Mr. Medley testified that Southern Scrap's direct employees would do burning work every day that Steel Processing's crew worked.
We are satisfied that Southern Scrap carried its burden of proof and that it is entitled to tort immunity as plaintiff's statutory employer.[1] Indeed, the instant case, tragic as it is, epitomizes the quid pro quo of the workplace: medical care and compensation benefits in exchange for tort immunity. Berry v. Holston Well Service, Inc., supra.

ODECO
The issue of Odeco's liability as the alleged owner of the tank that exploded is not as straightforward as the issue of Southern Scrap's status as statutory employer. We are called upon to decide whether there existed at the time of the accident any relationship between Odeco and the tank which imposed liability without fault or gave rise to a duty that Odeco breached. For the purpose of our analysis, we pretermit any discussion of the sufficiency of plaintiff's proof at trial and the propriety of allowing plaintiff another attempt at proof via newly discovered evidence. Instead, we assume, merely for the sake of discussion, that plaintiff satisfactorily carried his burden of proving that the tank at a time previous to the accident was owned and used by Odeco in its oil drilling business. Identification of the specific substance in the tank was unnecessary. The fact that it exploded when ignited by the torch flame proved that the residue in the tank was combustible and created a hazard which required specific safety measures.
During September of 1980, Odeco and Southern Scrap entered into a bilateral contract confirmed by two letters which were introduced into evidence at the trial. By letter dated September 16, 1980, Odeco requested that Southern Scrap remove miscellaneous scrap from its Delta yard and its Bayou Boeuf yard in exchange for the value of the miscellaneous scrap and junk metal. Odeco requested that one junk bin and one trash bin be located at each yard, with Southern Scrap to provide equipment and personnel for 24-hour removal service. Southern Scrap, through Mr. Hunter, accepted Odeco's offer by letter dated September 22, 1980. Mr. Hunter emphasized in his letter the importance of Odeco's agreement to separate the scrap iron, which was to go into the scrap bin, from *1183 the other debris, such as tin, sheet iron, and cable, which was to go into the trash bin. The letter specified:
The trash shall not include any closed containers or paint cans. The waste disposal plant will not accept these items. This includes 55 gallon drums. The waste disposal plant will not accept any caustics, acids or materials that would be considered hazardous waste(.) (I)f any material is rejected by the waste plant it will be returned to you and it will be your responsibility to dispose of the material.... I cannot haul trash, debris, cable, etc. to my yard and the waste plant will not accept scrap iron.
Plaintiff argues that the exclusion of closed containers from the contract between Odeco and Southern Scrap prevented ownership of the tank in question from passing from Odeco to Southern Scrap. We disagree.
It is obvious to us that plaintiff's designation of the contents of the tank as "hazardous" and Mr. Hunter's reference to "hazardous waste" are two different things. The hazard of which plaintiff complains was the volatile nature of the tank's contents. The hazardous waste referred to by Mr. Hunter of Southern Scrap was any substance which would have caused the trash to be rejected by the waste plant because it presented a pollution problem. The tank in question was not wayward waste that found its way to the scrap bin instead of the trash bin. It was scrap iron, albeit in the form of a closed container, which was correctly relegated to the scrap bin.
Southern Scrap was not equipped to handle liquid waste, such as the residue from 55 gallon drums. Odeco's warehouse manager, Mr. James Harris, explained the process Odeco used to clean the drums, thus avoiding pollution when the drums were disposed of. But Southern Scrap was equipped to handle, and did handle, closed scrap iron containers with residues of volatile substances. It was routine procedure for closed containers, even those which contained no markings of "Flammable" or "Combustible" such as the one in question here, to be tested prior to demolition at Southern Scrap's yard. There was testimony that Southern Scrap had a device called a "sniffer" which was usually used to determine if any closed scrap containers were "hot." If the containers tested positive for dangerous residue, the tanks were flushed out before demolition was begun.
Additionally, Steel Processing's supervisor normally conducted his own test on a container such as the tank in question. The plaintiff explained Mr. Medley's test, as follows: "[W]hen a closed container would come out there, he [Medley] would either ... if he would see it before they would unload it or something like, or they done put it on the ground, he'd check it out. You know, he'd get a torch. He'd try to cut it just to see if it was safe or not; and if it was safe, he'd let the burners go ahead and work on it." Unfortunately, the tank that exploded somehow slipped through Southern Scrap's and Steel Processing's testing procedures, and the plaintiff simply assumed that the tank had been tested.
Thus, plaintiff's argument that the tank did not become the property of Southern Scrap because of the contract exclusion of closed containers is without merit. Southern Scrap exercised dominion over the tank as owner by removing the tank from Odeco's yard, by placing the tank in its own yard for demolition, and, after the accident, by completing the demolition of the tank so that the scrap could be sold in a "business as usual" fashion. Indeed, Steel Processing completed the task which plaintiff had begun, and presumably it was paid for the weight of that scrap.
Plaintiff correctly points out that some of the testimony concerning Southern Scrap's acceptance of closed containers is in conflict. However, the jury was entitled to resolve the conflict according to its appreciation of the credibility of the witnesses. The conflicting testimony does not approach manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
We know of no application of strict liability which extends a person's responsibility for a structural defect in a thing beyond the point in time when he has divested *1184 himself of the ownership of the thing. Plaintiff's reliance on the case of Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987) is misplaced. In that case the issue was whether the owner of a thing containing structural defects continues to have garde of the thing when he lends it to another. Ross did not deal with divestiture of ownership as we have in the present case.
The thrust of plaintiff's negligence case, both at trial and on appeal, was that Odeco should have flushed out the tank before it transferred possession of the tank to Southern Scrap. We conclude, as the jury must have concluded, that Odeco as former owner was under no duty to clean the tank prior to the time it was picked up by its new owner, Southern Scrap.
Plaintiff also contends that as owner of the tank, Odeco had a duty to warn the buyer or transferee of its dangerous propensities. The duty to warn arises in products liability litigation when a product becomes unreasonably dangerous because a manufacturer or vendor fails to warn the consumer of a danger inherent in the normal use of its product, which danger is not within the knowledge of or is not obvious to the ordinary user. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). An essential element of a claim based on failure to warn is a reasonable relationship between the omission of the manufacturer or vendor and the injury. Bloxom v. Bloxom, 512 So.2d 839 (La. 1987).[2]
In the present case it is undisputed that the tank which exploded had no labels indicating what the tank had contained in the past. But ownership of the tank was not transferred for the purpose of continued use of the tank as a container; ownership was transferred for the purpose of having the tank demolished. A similar accident involving a Southern Scrap employee was litigated 25 years ago in the case of Foster v. American Oil Co., 172 So.2d 334 (La. App. 4th Cir.), writ denied, 247 La. 1007, 175 So.2d 299 (1965). The language of the opinion is just as persuasive today as it was then:
The nature of the transaction herein can give rise to no duty on the part of the defendants to warn plaintiff of the condition of the tanks. The tanks were sold not as tanks which were in working condition and could be used for the storage of oil, but as scrap which had no value except for salvage. The very nature of this transaction implies this. The defendants relied on the superior expertise of Southern Scrap in performing this type of demolition. This being so, they could expect Southern Scrap, plaintiff's employer, to take the proper precautions in dismantling the tanks to prevent injury. In other words, if there was a duty to warn plaintiff that the top of the tank was defective, it was incumbent upon Southern Scrap to discover the defect and conduct the demolition in a manner that would be safe.
The plaintiff worked for an employer expert in demolition of objects suitable only for scrap; this business is hazardous in nature.... As a matter of fact, plaintiff and his employer knew more of the conditions to expect in working on jobs of this character than the prior owners of the tanks.
172 So.2d at 336, 337.
The underlying policy of imposing a duty to warn on a manufacturer or vendor is for the protection of buyers or ultimate users who are unaware of the hazard associated with use of the product. See Toups v. Sears, Roebuck & Co., Inc., 507 So.2d 809 (La.1987). The policy is not applicable when the buyer would not have heeded the *1185 warning (Bloxom v. Bloxom, supra) or when the transferor and the transferee are equally knowledgable about the inherent danger (Foster v. American Oil Co., supra).
In the instant case both Odeco and Southern Scrap were aware that the tank would be cut into in some fashion. The danger of cutting into a closed container was common knowledge among the parties to this lawsuit, including the plaintiff.[3]
Accordingly, we conclude that Odeco, having divested itself of ownership of the tank, cannot be strictly liable for the harm which the tank caused. Nor can Odeco be liable for breach of a duty to plaintiff when there was no duty on Odeco's part either to clean the tank before transferring it or to warn of the hazardous residue in the tank.
Finding that the plaintiff is not entitled to judgment against either defendant, we affirm the judgment of the trial court rendered pursuant to the jury verdict. Appellant is to pay all costs of appeal.
AFFIRMED.
NOTES
[*] Judge Lewis S. Doherty, III, is serving pro tem by special appointment by the Louisiana Supreme Court in the absence of Judge Melvin A. Shortess.
[1] On appeal, the plaintiff has assigned as error the trial court's failure to determine the issue of statutory employment as a matter of law. As previously mentioned, our conclusion on appeal would be the same whether we were reviewing the trial court's ruling or the jury verdict. Cf. Solet v. K-Mart Corp., 555 So.2d 35 (La.App. 1st Cir.1989), writ denied, 558 So.2d 572 (La. 1990).
[2] The need for a warning is determined by an objective standard: what the ordinary user would know about the hazard. Halphen v. Johns-Manville Corp., supra. Once a lack of adequate warning is proved, a presumption arises that the plaintiff user would have read and heeded the warning which the vendor neglected to provide. However, the presumption is rebutted if the manufacturer or vendor produces evidence which persuades the trier of fact that an adequate warning would have been futile. Bloxom v. Bloxom, supra. Thus, the test becomes a subjective one: had there been a warning, would the user have heeded it? Toups v. Sears, Roebuck & Co., Inc., 507 So.2d 809 (La.1987).
[3] The plaintiff admitted making the assumption that the unmarked tank had been tested, although he had not seen Mr. Medley check it. The plaintiff stated that he would not have cut on the tank if he had known that Mr. Medley had not tested it. Thus, the lack of a warning on the tank was not determinative of plaintiff's decision to begin cutting on the tank.