572 So.2d 299 (1990)
Dianne Shivor CANNON, et al., Plaintiffs/Appellants,
v.
CAVALIER CORPORATION, et al, Defendants/Appellees.
No. 21935-CA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 1990.
*301 Shotwell, Brown & Sperry by George Wear, Jr. & C.A. Martin, III, Monroe, for plaintiffs-appellants.
Hayes, Harkey, Smith & Cascio by Haynes Harkey, Monroe, for defendants-appellees.
Before FRED W. JONES, Jr., SEXTON and LINDSAY, JJ.
LINDSAY, Judge.
The plaintiff, Dianne Shivor Cannon, suing individually and on behalf of her two minor children, Joshua Michael and Jamie Nicole, appeals from a jury verdict rejecting her wrongful death, survival, and products liability claims against Eagle Electric Manufacturing Company (Eagle) and its insurer, Zurich American Insurance Company. For the following reasons, we reverse the trial court judgment.

FACTS
The plaintiff's husband, Michael Cannon, was employed by the Ouachita Coca-Cola Bottling Company in Monroe as a cooler service repairman. On May 13, 1986, Mr. Cannon was called to the Monroe municipal golf course pro shop to repair a Coca-Cola soft drink machine (Coke machine) that was not cooling properly. In the course of trying to move the machine away from the wall, Mr. Cannon was electrocuted.
The Monroe Municipal Golf Course Pro Shop was run by John W. Myers who had an employment contract with the City of Monroe. In 1972, Myers purchased a Coke vending machine from Ouachita Coca-Cola Bottling Company. The Coke machine was manufactured by the Cavalier Corporation. When originally delivered, the Coke machine was placed at the far end of the Coke room and plugged directly into the wall outlet. At some time prior to the accident, the Coke machine was moved in front of a door in order to prevent forced entry into the pro shop. The Coke machine was placed beside a Tom's candy vending machine.
*302 The power cord on the Coke machine was too short to reach the nearest wall outlet, and at some point in time the power cord was plugged into an adapter manufactured by Eagle. This adapter allowed a three-pronged machine power cord to be plugged into a two-pronged extension cord. The extension cord was attached in such a way that the polarity of the extension cord was lost. This extension cord was then plugged into the wall outlet.
The adapter was designed for use to convert a two-pronged wall outlet to allow its use with three-pronged appliance cords. The adapter has a metal tab which is designed to be connected to the grounded center screw of a two-pronged wall outlet. However, when used with an extension cord, as in this case, the grounding tab on the adapter could not be connected to the grounded screw in the wall outlet. Therefore, the Coke machine in the pro shop was ungrounded.
On May 12, 1986, the City of Monroe was notified that the fuses for the pro shop Coke room were going out for some reason. The City sent an employee to check on the problem. This employee inserted a 30 amp fuse into a slot designed for a 20 amp fuse in the fuse box and then turned on the electricity. Upon energizing the fuse box, the employee heard a noise which he determined came from the Coke machine. The employee unplugged the Coke machine at the wall socket and advised the pro shop staff to call the Coca-Cola company.
Later that day, Mr. Cannon arrived to repair the Coke machine. Mr. Cannon made a repair to the Coke machine and believed that the problem was alleviated.
On the morning of May 13, 1986, the Coca-Cola company was called because the Coke machine was not cooling the soft drinks. No fuses were being blown and had not been blown since being replaced by the city employee the day before. Mr. Cannon was again dispatched to repair the Coke machine.
Unknown to Mr. Cannon, the Coke machine had a short circuit in the compressor. Due to the short circuit in the compressor, voltage traveled to the frame of the ungrounded machine. When Mr. Cannon grasped the Coke machine in an attempt to move it away from the wall, he brushed against the Tom's candy machine next to it. The Tom's candy machine was grounded. When Mr. Cannon brushed against the Tom's candy machine, the electricity from the ungrounded Coke machine passed through Mr. Cannon's body to the electrical ground on the candy machine. This caused Mr. Cannon's death by electrocution.
Mrs. Cannon filed suit on behalf of herself and on behalf of her two minor children. Named as defendants were Cavalier Corporation, manufacturer of the Coke machine; the City of Monroe; John Meyers, who operated the city golf pro shop; and Eagle, the manufacturer of the adapter. The plaintiff twice amended the petition, ultimately adding the Crane Company, a successor corporation to Cavalier Corporation, the Cavalier Corporation's insurance, company and Zurich American Insurance Company, the insurer of Eagle.
American Employer's Insurance Company, the worker's compensation insurer of Ouachita Coca-Cola Bottling Company, intervened to recover worker's compensation benefits paid on behalf of the decedent.
Cavalier and its insurer filed a third-party demand against Tecumseh Products Company, the manufacturer of the compressor unit in the Coke machine which developed the "short."
Ultimately, the plaintiff settled with Cavalier and its insurer; Crane, the successor company to Cavalier; the City of Monroe, on behalf of itself and John W. Meyers; and Tecumseh Products Company. The plaintiff also settled with the worker's compensation insurer, whereby the insurance company agreed not to seek recovery from any judgment rendered in the plaintiff's favor.
The plaintiff then proceeded to trial only against Eagle and its insurer, Zurich American.
Prior to trial, the plaintiff filed a motion in limine to prohibit the introduction of evidence tending to establish the fact of *303 settlement with other parties. The trial court ruled "that the jury will be told that there were other parties who have been dismissed or released from the lawsuit. The word settlement will not be used. But, either side is free to make reference during the course of the trial to parties present or parties dismissed."
Trial was held before a jury in August, 1989. At the conclusion of the trial, the jury rejected the plaintiff's claims. The jury concluded that the adapter manufactured by Eagle was not unreasonably dangerous per se. The jury also found that Eagle did not fail to provide adequate warnings about the product in question. A judgment in favor of Eagle and its insurer, Zurich American Insurance, denying the plaintiff's claims, was signed by the trial court on September 5, 1989.
The plaintiff appealed, asserting numerous assignments of error.

DISCUSSION OF DISCHARGE OF SETTLING DEFENDANTS
The plaintiff, in several assignments of error, argues that the trial court erred in allowing discussion of the settlements between the plaintiff and other parties to this suit. The plaintiff argues that discussion of the settlements prejudiced her claims in the eyes of the jury and resulted in the jury denying recovery. Because of our disposition of this case, reversing the trial court judgment and awarding damages to the plaintiff, it is unnecessary to address these assignments of error.

UNREASONABLY DANGEROUS PER SE
The accident in the present case occurred prior to September 1, 1988, the effective date of the Louisiana Products Liability Act contained in LSA-R.S. 9:2800.51 et seq. This court has held that the Louisiana Products Liability Act is not retroactive. McCoy v. Otis Elevator, 546 So.2d 229 (La.App. 2d Cir.1989), writ denied 551 So.2d 636 (La.1989); Berry v. Commercial Union Insurance Company, 565 So.2d 487 (La.App. 2d Cir.1990). The parties agree that the present case is governed by Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986), and its progeny.
Halphen, supra, established four basic theories of products liability, including unreasonably dangerous per se, unreasonably dangerous in construction or composition, unreasonably dangerous for failure to warn of a danger inherent in the normal use of the product, and unreasonably dangerous in design. The plaintiff in the present case first contends that the adapter manufactured by the defendant is unreasonably dangerous per se.
Halphen, supra, holds that a product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product. The fact that a risk or hazard related to the use of the product was not discoverable under existing technology or that the benefits of the product appeared greater than they actually were is irrelevant. When a product is found to be unreasonably dangerous per se, liability may be imposed solely on the basis of the intrinsic characteristics of the product, irrespective of the manufacturer's intent, knowledge or conduct, Halphen v. Johns-Manville Sales Corporation, supra.
In the present case, the plaintiff argues that the adapter at issue has outlived the purpose for which it was intended and is now unreasonably dangerous per se. The plaintiff argues that prior to the 1950's, all 120 volt electrical outlets had receptacles for two prongs. The plaintiff contends that in the 1950's, this system was changed to a three-pronged, grounded system. The adapter was designed to bridge a gap in technology by allowing a three-pronged appliance cord to be safely plugged into a two-pronged electrical outlet. In order to properly ground the appliances, the adapter is equipped with a tab or wire which is designed to be attached to the grounded center screw of the electrical outlet. When the adapter is properly installed, and the three pronged appliance cord is plugged in, the appliance is then *304 grounded. The adapter is not intended to be used to attach a three-pronged appliance cord to a two-pronged extension cord. Misusing the adapter in this way makes it impossible to properly ground the appliance.
The plaintiff contends that the use of two-pronged outlets is decreasing and yet the sale of adapters is increasing, leading to the conclusion that the misuse of the device is increasing. The plaintiff argues that, given the waning utility of this device as opposed to the danger created by its misuse, the adapter is unreasonably dangerous per se.
The record in the present case does not support the plaintiff's argument that the danger-in-fact of the product outweighs its utility. While the product obviously poses a risk when misused, it appears to be safe when properly used. It also appears that there are still many buildings which were constructed prior to the time when three-pronged outlets came into common use. As long as such buildings exist, adapters will be necessary in order to utilize new appliances having power cords with three-pronged plugs. Based upon the facts in this record, the plaintiff has failed to show that the adapter is unreasonably dangerous per se.

UNREASONABLY DANGEROUS FOR FAILURE TO ADEQUATELY WARN
The plaintiff next argues that the trial court erred in failing to find that the adapter was unreasonably dangerous for failure to provide an adequate warning of the dangers inherent in normal use. This argument has merit.
Under Halphen v. Johns-Manville Sales Corporation, supra, a manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. See also Shipley v. Recreation and Park Commission for the Parish of East Baton Rouge, 558 So.2d 1279 (La.App. 1st Cir. 1990); Manuel v. Odeco, Inc., 563 So.2d 1179 (La.App. 1st Cir.1990).
"Normal use" is a term of art that includes all intended uses as well as all foreseeable uses and misuses of the product. Bloxom v. Bloxom, 512 So.2d 839 (La. 1987); Ingram v. Caterpillar Machinery Corporation, 535 So.2d 723 (La.1988).
A manufacturer is obligated to anticipate the environment in which the product will be used and to give notice of the potential risks arising from foreseeable use in a foreseeable environment. Bloxom v. Bloxom, supra.
As was stated in Bloxom v. Bloxom, supra:
Although a manufacturer markets a product for an intended use, in considering various instructions and warnings, a manufacturer may not simply close his eyes to the hazards associated with foreseeable misuse of the product. When product misuse and its attendant risks are reasonably foreseeable, the manufacturer is in the best position to avoid product related injuries by giving an adequate warning.
An essential element of a cause of action based on failure to adequately warn of a product's danger is that there must be a reasonable relationship between the omission of the manufacturer and the injury. Ingram v. Caterpillar Machinery Corporation, supra.
The court in Bloxom v. Bloxom, supra, stated that, once a plaintiff proves that a lack of an adequate warning or instruction rendered the product unreasonably dangerous, a presumption arises that, had adequate warnings been given, the user would have read and heeded such admonitions. This presumption may be rebutted if the manufacturer produces contrary evidence which persuades the trier of fact that an adequate warning or instruction would be futile under the circumstances.
There is no dispute in this case that the improper use of the adapter to connect the extension cord to the power cord of the Coke machine, without adequately grounding the machine, was one of several factors contributing to the death of the decedent. In the present case, the record shows that a common and foreseeable danger in the *305 normal use (or misuse) of adapters is that they will be improperly used with extension cords, thereby resulting in an ungrounded connection between an electrical outlet and an appliance. Clearly, manufacturers have a duty to warn against the dangers of misuse of this product.
In this case, the adapter did carry a warning which read "Cautionconnect tab to grounded screw." This warning complies with Underwriters Laboratories, Inc., (UL) warnings for use with such adapters. The UL rule regarding such adapters specifies in pertinent part,
An adapter having a fixed grounding ear, lug, or similar device ... shall be marked "CAUTIONConnect tab to grounded screw" or equivalent wording following the word CAUTION. This marking shall be plain and legible on each adapter where visible before installation.
The defendant argues that the warning on the adapter was in accordance with the safety guidelines established by UL and was therefore adequate. We note that traditionally, our courts have recognized safety rules established by the National Electric Code and the American National Safety Institute to be guidelines only and not definitive on issues of liability. Winterrowd v. Travelers Indemnity Company, 452 So.2d 269 (La.App. 2d Cir.1984), affirmed 462 So.2d 639 (La.1985); Parker v. South Louisiana Contractors, Inc., 370 So.2d 1310 (La.App. 1st Cir.1979), writ denied 374 So.2d 662 (La.1979); Bowles v. Litton Industries, Inc., 518 So.2d 1070 (La. App. 5th Cir.1987). Likewise, in this case, the UL requirements for warnings on adapters are merely guidelines and not definitive on the issue of the adequacy of warnings.
The determination of whether a warning is adequate depends upon a balancing of considerations as set forth in Bloxom v. Bloxom, supra. In that case, the court specified that among factors to be considered are the severity of the danger, the likelihood that the warning will catch the attention of those who will foreseeably use the product and convey the nature of the danger to them, the intensity and form of the warning, and the cost of improving the strength or mode of the warning.
Applying these guidelines to the facts of this case, we find that the warning on the adapter was not adequate. A foreseeable misuse of these adapters includes the risk of injury or death by electrocution. Therefore, the severity of the danger to be warned against is great.
The warning in the present case is not sufficient to catch the attention of the user and to convey the nature of the danger. The body of the adapter at issue here is made of gray plastic. The warning is formed from the plastic and is the same color as the body of the adapter. The letters spelling out the warning are extremely small, almost tiny. The warning is located above the two brass prongs which are meant to be plugged into a two-pronged outlet. The location of the warning is such that it may be seen by a user, that is, the one who installs it, but the warning does not stand out sufficiently to be readily seen. In fact, it can hardly be seen with the naked eye. Further, to see the warning, one must carefully and closely examine the face of the adapter before the lettering can be discerned. Further, the warning does not convey the nature of the danger, electrocution, which may occur if the grounding tab is not connected to a grounding screw.
Also, the warning is not sufficiently intense to properly convey the danger inherent in the misuse of the adapter. The plaintiff presented the testimony of Mr. Dennis Howard, a safety consultant, who was accepted as an expert in safety management and who testified regarding the adequacy of warnings. According to Mr. Howard, warnings are comprised of three elements, an appropriate signal word, a statement of the severity of the circumstances and a listing of safe uses for the product. Mr. Howard testified that the word "caution" is the least forceful word used in warnings, and that the words "warning" and "danger" are more forceful. Mr. Howard also stated that the cautionary warning on this adapter is silent as to the *306 severity of consequences of misuse. In addition, the warning does not clearly spell out safe uses for the product. Mr. Howard testified that an example of an adequate warning would begin with the word "danger" and would specify that, in order to avoid electric shock or death, the tab on the adapter must be connected to a grounded screw. Mr. Howard also stated that a proper warning would indicate that the adapter is not to be used with an extension cord or used outdoors and that the adapter is to be used with the proper polarity with the electrical outlet.
Finally, it appears that the cost of strengthening or modifying this warning would be minimal. Mr. Howard, testified that an adequate warning could be formulated and put on a sticker to be placed on the adapter. The cost for adding such a warning to adapters would likely be very slight.
We also note that the warning located on the adapter itself is the only warning given with the adapter. The defendant's representative testified that these adapters are sold in bulk. In most cases, there is no packaging with the adapter on which a more extensive warning and instructions could be given.
The plaintiff introduced at trial adapters made by other manufacturers. These adapters are sold in packaging which carries extensive warnings and instructions for use. This packaging may satisfy the manufacturer's duty to warn. However, as pointed out above, it was not shown that the adapter in question was sold with such warnings.
We are mindful of the fact that the determination of whether a warning is adequate is a question for the trier of fact. Bloxom v. Bloxom, supra. However, we find that, based upon the evidence before us, the jury determination that the warning in the present case was adequate is clearly wrong and manifestly erroneous and must be reversed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), on remand 370 So.2d 1262, writ denied 374 So.2d 660 (La.1979); Canter v. Koehring, 283 So.2d 716 (La. 1973).
Several Louisiana cases have dealt with electrocution deaths and the adequacy of warnings on products. However, we find these cases to be distinguishable from the present case and are therefore not controlling.
In Lovell v. Earl Grissmer Company, Inc., 422 So.2d 1344 (La.App. 1st Cir.1982), writ denied 427 So.2d 871 (La.1983), the decedent was electrocuted while using an appliance to clean the exterior of his house. The appliance was attached to an extension cord which was plugged into an ungrounded outlet. When the connection between the extension cord and the appliance cord became wet, the decedent was electrocuted. The appliance carried a warning to waterproof any connections to extension cords. The court held that this warning was adequate because the danger of electrocution arising from a wet electrical connection is obvious. In the present case, the warning on the adapter is much more vague than the warning in Lovell. The danger of electrocution from the misuse of the adapter is not at all obvious. Therefore, Lovell is distinguishable from the present case.
In Brannon v. Babin, 221 So.2d 336 (La.App. 3rd Cir.1969), the decedent was electrocuted while using a car washing machine which carried a warning to ground the machine before using it. The decedent used an adapter to connect the appliance cord to a two-pronged extension cord. The adapter then became wet during use. The court held that the decedent's failure to heed the warning to ground the machine was the cause of his death, rather than the inadequacy of the warning.
In Brannon, the warning on the machine to be sure the machine was grounded appears to have been much more visible than the warning in the present case and the decedent's harm came from a failure to comply with the warning. Also, allowing the machine connnection with the extension cord to become wet was a contributing factor to the death in Brannon. As in Lovell, the danger inherent in using an appliance with a wet electrical connection is obvious. These are factors not present in *307 the case before us. Therefore, Brannon is not applicable to this case.
In Ducote v. Liberty Mutual Insurance Company, 451 So.2d 1211 (La.App. 4th Cir. 1984), writ denied 457 So.2d 15 (La.1984), a construction worker was electrocuted when a power tool he was using was plugged into an ungrounded outlet. The plaintiff contended that the warning regarding the need to have the tool grounded was not sufficient. The court found that the warning was sufficient and stated that where a professional is involved (such as a construction worker accustomed to using power tools) the warning does not have to be as strong. In the present case, the warning on the adapter was not intended for professionals, but for the ordinary consumer without special knowledge regarding electricity. Therefore, the holding in Ducote is also distinguishable.
We therefore conclude the facts of the present case are distinguishable from prior cases dealing with warnings on electrical appliances.

DAMAGES
Because we find that the defendant breached its duty to adequately warn of the dangers inherent in the misuse of its product and because such misuse was a contributing factor to the decedent's electrocution, we must now assess damages.
The plaintiff sought recovery for the decedent's pain and suffering and for the decedent's lost past and future earnings. The plaintiff also sought recovery for the loss of affection, support, services and society, individually and on behalf of the children. An award for these damages is proper.
A court may award damages for the pain and suffering of the decedent where there is the smallest evidence of pain on the part of the victim, by his actions or otherwise. Pierre v. Lallie Kemp Charity Hospital, 515 So.2d 614 (La.App. 1st Cir.1987), writ denied 515 So.2d 1111 (La.1987); Cupstid v. Harrison Hardwood Manufacturing Company, 552 So.2d 1223 (La.App. 3rd Cir.1989), writ denied 558 So.2d 572 (La.1990). In the present case, Mr. Grover C. Kelly, an employee of the golf shop, was present when the decedent was electrocuted. Mr. Kelly testified that as the decedent was attempting to move the Coke machine away from the wall, he heard the decedent make a moaning noise. Mr. Kelly asked the decedent if his arm was caught but the decedent did not respond. He then fell straight back against the concrete floor. An ambulance was called and resuscitation efforts were made by Mr. Meyers and a customer, a Mr. McDonald. Mr. Cannon was alive and gasping for breath. The ambulance arrived a short time later, but Mr. Cannon died before he could be transported to the hospital.
Under the facts and circumstances, we find sufficient evidence upon which to award damages for Mr. Cannon's pain and suffering before his death. Accordingly, we award damages in the amount of $10,000.[1]
The plaintiff also sought damages for the wrongful death of Mr. Cannon. The elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Watson v. C.R. Bard, Inc., 557 So.2d 739 (La.App. 2d Cir. 1990).
In the present case, the decedent was a young husband and father. Mr. and Mrs. Cannon were married in 1979. Their children were born in 1982 and 1985. The family was very close and heavily involved in church related activities. The decedent was the director of a children's choir at church. Based upon the evidence contained in the record regarding the close family ties between the decedent, his spouse and his children, we award the decedent's spouse, Dianne Shivor Cannon, $200,000 in general damages. We award $150,000 in general damages to each of the decedent's two children. Sorrells v. Eddie *308 Knippers Associates, Inc., 544 So.2d 556 (La.App. 1st Cir.1989); Ingram v. Caterpillar Machinery Corporation, supra; Thomas v. State Farm Insurance Company, 499 So.2d 562 (La.App. 2d Cir.1986), writ denied 501 So.2d 213, 215 (La.1987).
The plaintiff also sought to recover for the decedent's funeral expenses. Such an award is proper based upon the facts of this case. The record indicates that the parties had stipulated the amount of funeral expenses although the actual amount of this expense is not found in the record. (The verdict form presented to the jury showed that these expenses had been stipulated.) Therefore, although we are unable to award a specific amount because of the absence of any amount in the record, we nevertheless note that the plaintiff is entitled to collect the stipulated amount of funeral expenses.
The plaintiff is also entitled to recover for the lost earnings of the decedent. At trial, the plaintiff presented the testimony of an expert economist, Randy Rice, who estimated the present value of the decedent's lost past and future earnings, taking into account the decedent's age, his personal consumption, the retirement age of 65 with Coca-Cola Company, a high probability that the decedent would have received a promotion had he not died, the fringe benefits connected with his employment, and his pension as well as the age of the decedent's children. This witness testified that the present value of the decedent's lost past and future earnings is $898,000. This computation made no allowance for taxes which would have been paid by the decedent. On cross-examination, the expert stated that taxes would reduce this amount by eleven or twelve percent.
The defendant also offered expert testimony from an economist, Jerry M. Hood, as to the amount of lost past and future earnings. This expert did not consider the high probability that the decedent would soon be promoted, but calculated the loss based on the decedent's income at the time of his death. Although this expert computed period raises the decedent would receive through the years, he did not compute the decedent's fringe benefits or pension. This expert also used the Bureau of Labor Statistics work life expectancy table to compute the decedent's expected work life, rather than assuming the decedent would work until the retirement age of 65 at Coca-Cola. Based upon these calculations, this expert testified that the present value of the decedent's lost past and future wages is $341,133.41.
The defendant also offered the testimony of a structured settlement broker, Warren Brandis, who testified that, based upon the decedent's salary at the time of his death, an annuity investment of $257,345 would satisfy the decedent's lost past and future wages. However, this calculation does not consider the decedent's probable promotion or periodicraises that he would have received.
Based upon these conflicting calculations, and considering the various factors outlined by the experts and considering several factors excluded from each calculation, we believe that justice will be served by an award of $450,000 for the decedent's lost past and future earnings.

APPORTIONMENT OF FAULT
Even though we find that the defendant's failure to adequately warn against the dangers arising from the misuse of its product contributed to Mr. Cannon's death, thereby rendering the defendant liable to the plaintiff for damages, we do not find that the defendant's fault was the sole cause of this accident.
The accident in this case was in fact caused by several factors, including the short circuit in the Coke machine, and the fact that a 30 amp fuse was used in the fuse box at the pro shop rather than a properly sized 20 amp fuse. This allowed the Coke machine to function in its dangerous condition without interruption of electrical power. Also, the fact that the polarity on the extension cord was reversed, plus the fact that the Coke machine was placed in close proximity to the candy machine, contributed to the accident. These factors, in addition to the misuse of the adapter *309 manufactured by the defendant, contributed to the decedent's harm.
Further, the facts in the record show that the decedent himself was not without fault in causing the accident. Mr. Cannon was a trained repairman. General instructions for working on soft drink machines required that the machine first be unplugged. Mr. Cannon had worked on this machine the day before and should have been aware of the faulty connection between the extension cord and the power cord to the Coke machine which caused it to be ungrounded. In addition, Mr. Cannon's repair of the machine the day before failed to correct the short circuit in the compressor. Based upon these factors, we find that Mr. Cannon was 40% at fault in causing the accident.
The evidence and expert testimony show that there was no defect in the Coke machine itself and that the short circuit in the compressor was not caused by a design or manufacturing defect but was simply the result of normal use for approximately 14 years. The Coke machine was designed to be grounded to the electrical outlet thereby providing protection against the kind of harm which occurred here. Had the machine been so grounded, the accident would not have occurred. Therefore, under the evidence presented in this case, no degree of fault can be assessed against Cavalier Corporation or Tecumseh.
The greatest degree of fault appears to rest with the City of Monroe, Johnny Myers, and other unknown employees of the city. These parties were negligent in moving the Coke machine away from the wall outlet, installing a 30 amp fuse in the fuse box when a 20 amp fuse was the proper size, and in reversing the polarity of the extension cord when attaching that cord to the Coke machine. Also, the city was responsible for the electrical system in the pro shop and was remiss in not inspecting the premises and discovering the dangerous manner in which the Coke machine was connected.
Therefore we find that the City of Monroe and its employees were 50% at fault in causing the accident.
Based upon all these facts, and noting that many diverse factors come together at one time to cause Mr. Cannon's death, we assess the defendant with 10% fault in its failure to adequately warn of the dangers inherent in the misuse of its product which contributed to the cause of this accident.
However, we also note that the plaintiff settled with other parties originally sued in this case. This removed Eagle's right of contribution from those parties. Nevertheless, Eagle is entitled to have its obligation to the plaintiff reduced proportionally by the degree of fault attributed to the settling defendants and by the degree of fault attributed to the decedent. Accordingly, Eagle's liability for its fault is 10% of the total damage award. LSA-C.C. Art. 2323; Garrett v. Safeco Insurance Company, 433 So.2d 209 (La.App. 2d Cir. 1983).

CONCLUSION
Based upon our conclusion that the Eagle adapter was unreasonably dangerous for failure to provide an adequate warning of the dangers inherent in normal use, we reverse the trial court judgment. We find that the defendant's breach of this duty was a contributing cause of the decedent's death, and we find that the defendant's degree of fault in causing the accident was 10%.
We award damages to the plaintiff for the decedent's pain and suffering, for the loss of income and for general damages.[2] Under the facts of this case, we find that the following amounts are to be awarded to the plaintiff:

 Pain and suffering of the decedent 10,000.00
 Lost past and future earnings 450,000.00
 Loss and affection to spouse,
 Dianne Shivor Cannon 200,000.00
 Loss of love and affection to
 minor child, Joshua Michael
 Cannon 150,000.00
 Loss of love and affection to
 minor child, Jamie Nicole Cannon 150,000.00
 ___________
 TOTAL $960,000.00

*310 Due to the assessment of fault of 10% to the defendant, Eagle Electric Manufacturing, we find that the defendant is liable to the plaintiff for 10% of the total damages, plus 10% of the stipulated amount of funeral expenses. Costs are assessed to the defendant in proportion to its degree of fault.
Judgment is rendered as follows:
IT ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiff, Dianne Shivor Cannon, individually and on behalf of her two minor children, Joshua Michael Cannon and Jamie Nicole Cannon, and against the defendant, Eagle Electric Manufacturing Company and its insurer, Zurich American Insurance Company, in solido, in the full amount of $96,000, plus 10% of the stipulated funeral expenses of the decedent, plus interest thereon at the legal rate from the date of judicial demand, until paid.
Costs of these proceedings are assessed to the defendant, Eagle Electric Manufacturing Company and its insurer, Zurich American Insurance Company, in proportion to its degree of fault.
REVERSED AND RENDERED.
NOTES
[1] See Holloway v. State through DOTD, 562 So.2d 1033 (La.App. 3rd Cir.1990); Dotson v. Matthews, 480 So.2d 860 (La.App. 2d Cir.1985), writ denied 481 So.2d 1336 (La.1986).
[2] Funeral expenses should be awarded based upon the stipulations of the parties.